**Robbie Mae HATHAWAY**

v.

**WORCESTER CITY HOSPITAL et al.**

**Civ. A. No. 71–953.**

United States District Court,
D. Massachusetts.

April 6, 1972.

Mel L. Greenberg, Teshoian, Greenberg & Drapos, Worcester, Mass., for plaintiff.

Bennett S. Gordon, Asst. City. Sol., Worcester, Mass., for defendants.

Roger P. Stokey, Goodwin, Proctor & Hoar, Boston, Mass., for amicus curiae.

## OPINION

WYZANSKI, Senior District Judge.

■ Plaintiff is a married woman who has had numerous pregnancies and given birth to eight children who are now alive. She has high blood pressure, a hernia, and an obese condition which, in combination, make it dangerous to her life to have additional pregnancies. It is medically inadvisable for her to use pills, pessaries, diaphragms, coils or like devices to prevent birth. A condom, if used by her husband, might prove imperfect or ineffective through rupture; and there is no certainty that her hus-

band would use such a device constantly or properly.

Competent medical advisers have recommended that there be performed on plaintiff an operation to sever her Fallopian tubes so that she will not be able to become pregnant again.

A severance of plaintiff's Fallopian tubes would be wholly effective in preventing further pregnancies. A severance operation does not require a surgical skill nor involve a risk greater than an appendectomy. Ordinarily hospitalization for 3 or 4 days is sufficient following such an operation.

Plaintiff is economically in the less affluent classes, but is not on relief. She and her husband own their own home, and have a combined annual family income of $7500. She has insured herself with Blue Cross and Blue Shield. The expenses of hospitalization incurred during her last two pregnancies were paid by a combination of payments by her insurers and by herself.

The Worcester City Hospital is not a body corporate, but a division of the City of Worcester. It has both outpatient and in-patient services, the latter involving 448 beds. The American Hospital Association classifies it as an "acute short-term general hospital." This categorization, shared, for example, by The Massachusetts General Hospital, of world renown, The Boston City Hospital, The Cambridge City Hospital, and myriad Massachusetts hospitals reflects the fact that a hospital called an "acute short-term general hospital" performs medical and surgical services which do not involve cases of patients who are expected to be hospitalized indefinitely because of long-term illnesses. The categorization, however, does not indicate that the hospital performs, or does not perform, every type of surgery, e. g. brain surgery, transplant operations, abortions, or the ligation of Fallopian tubes.

Some acute short-term general hospitals, such as the Cambridge City Hospital, perform ligation of Fallopian tubes if recommended by competent medical advisers, regardless of whether the patient's life is at risk from further pregnancies. Other such hospitals perform such operations if recommended by competent medical advisers but only under extraordinary circumstances. Some such hospitals, of which the Worcester City Hospital is one, never perform such operations.

The statutes of Massachusetts have been interpreted by the City Solicitor of Worcester as making all such operations of doubtful legality. The Supreme Judicial Court of Massachusetts has not interpreted the application of Massachusetts law to such operations. It is arguable that one of three possibilities may be open under Massachusetts law: (1) that under no circumstances are such operations permissible; (2) such operations are permissible when recommended by competent medical advisers; or (3) such operations are permissible when so recommended, if further pregnancies involve risk of life to the patient or comparable dangers.

Acting on the basis of the legal opinion of the City Solicitor of Worcester, trustees in authority at the Worcester City Hospital have declined to permit their hospital to be used for operations severing Fallopian tubes. When the plaintiff and her medical advisers requested the hospital to perform such an operation upon her, the hospital, consistently with that general determination, refused to perform that operation.

Thereupon, relying upon 42 U.S.C. § 1983 and upon Massachusetts Acts of 1963, c. 266 and Massachusetts General Laws, c. 40 § 5(20), plaintiff brought this action both to compel the hospital, the chief of its surgical division, and president of its board of trustees, its chief of obstetrics, and its administrator, to perform such operation, and to secure a declaratory judgment. Plaintiff claims jurisdiction upon the basis of 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

It is transparent that plaintiff's substantive federal claim under 42 U.S.C. § 1983 is without merit.

We are not here dealing with a plaintiff who is unable to pay her own medical and surgical expenses.

We are not here dealing with a suit to nullify a state statute on the ground that it is repugnant to the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution.

The so-called federal substantive claim is nothing but an assertion that it is a deprivation of plaintiff's federal constitutional rights for a state agency to refuse to establish a practice of performing a particular kind of surgical operation for which it has the necessary physical and medical resources but which it does not choose to perform.

It is doubtful whether plaintiff's counsel or the judges by whom this case has previously been heard have fully grasped the enormity of the assertion.

If we assume that a state has adequate financial, physical, and human resources to perform an operation of a particular type, but a state agency on a non-discriminatory basis chooses not to perform any operation of such a type, an aggrieved person has no Constitutional right to compel it so to perform. The Constitution does not give to the judiciary, but to the legislature, the authority to tax and to spend, and the cognate authority to establish priorities and preferences with respect to the use of public resources. Were it otherwise, federal courts, without awaiting local or national legislation, could command the use of public funds to establish a social security system, a medical and hospitalization program, an educational hierarchy, an army and navy, a police force, a method of sewage and waste disposal, an arrangement for dealing with pollution, and all other parts of a governmental structure for the general welfare.

No doubt, there is substantial respectable authority for the view that it is in the public interest that the state should deal with population problems and in particular should come to the aid of women who want no more pregnancies. But the conflicts of view with respect to issues of this sort are to be settled at the polling booths or in legislative bodies; and if measures are to be taken they must be provided for by legislative direction and appropriation.

I have not discovered any Massachusetts statute which requires the City of Worcester or its hospital to perform surgery upon the Fallopian tubes, nor which requires a city or its hospital to render for non-necessitous persons whatever surgical services may be recommended by competent medical advisers.

I am mindful of the reference by the Court of Appeals in its December 23, 1971 Memorandum and Order and Mandate to the Massachusetts statutory phrase directing that the hospital receive "persons requiring relief during temporary sickness." But that phrase cannot reasonably be stretched by judges most sympathetic with population control or with women who want to enjoy sexual intercourse free of risk to require the Worcester City Hospital to perform a type of operation which is, to say the least, a subject of grave political debate, as to which there is not even within the medical profession unanimity of view, and as to which the evidence shows Massachusetts hospitals have differing practices and policies. Neither the Constitution nor the Massachusetts statutes made judges arbiters of such matters.

What we have here is a case of an over-zealous civic group, inspired by "Planned Parenthood", and an inexperienced group of publicly-minded lawyers, associated with the Civil Liberties Union, attempting to accomplish what may be a worthy end by going to the wrong address. Courts exist primarily to decide actual cases and controversies, as Article III of the United States Constitution commands, and not to create *ex nihilo* a system of social justice, general welfare, and private happiness.

Complaint dismissed with costs.

## APPENDIX

April 7, 1972.

WYZANSKI, Senior District Judge.

Mindful of Giotto's response to Boniface VIII (see Vasari, Lives of the Painters, Biography of Giotto), I drafted the opinion in this case without annotation and with a minimum of citation. However, in deference to those who seek to trace the opinion's roots, I attach hereto:

*Appendix A.* The opinion rendered by this court on June 10, 1971.

*Appendix B.* The December 23, 1971 memorandum and order of the Court of Appeals accompanying its mandate dated January 13, 1972.

*Appendix C.* The opinion filed by this court on March 21, 1972, but withdrawn on March 22, 1972, when it appeared that in several respects this court had been misled. First, it appeared that plaintiff was not, as this court and the Court of Appeals had earlier supposed, a recipient of welfare assistance. Second, the plaintiff's principal challenge to defendants rested upon a theory other than a claim that she, as a non-affluent member of the community, was entitled to receive at public expense the same medical treatment as would be available to an affluent member of the community at such affluent person's own expense. Third, this court had supposed that there was a colorable basis for alleging that there was a cause of action which presented a substantial claim within the federal jurisdiction of this court, and that therefore, under the doctrine of pendent jurisdiction (see United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218), a federal court could simultaneously deal with a claim that the plaintiff had been deprived of a right under state law which would not be cognizable in a federal court if presented separately. Presumably the Court of Appeals was similarly misled. My inclination, despite McCabe v. Nassau County Medical Center, Second Circuit, 1971, 453 F.2d 698, would have been to dismiss the complaint in this case for want of jurisdiction. But it seemed to me that it would be better to leave that possibility open to the Court of Appeals. Already, as the text of my opinion shows, I have taken considerable liberty in disregarding a mandate or so construing it as to avoid unnecessary labors by the seven justices of the Supreme Judicial Court of Massachusetts. Presumably they, and hopefully the Court of Appeals of this Circuit, would rather that this case be disposed of upon the main thrust of the complaint when upon analysis it appears that the court is being poked by a hollow stick.

## APPENDIX A

United States District Court
District of Massachusetts

Robbie Mae Hathaway

v.

Dr. E. J. Croce et al.

Civil Action
No. 71–953–W

## OPINION

June 10, 1971

WYZANSKI, Chief Judge.

Relying upon 42 U.S.C. § 1983, plaintiff, a resident of Worcester, brings this action against Worcester City Hospital and three individuals, Dr. Croce, president of the hospital's board of trustees and chief of its surgical division, Dr. Maher, chief of obstetrics, and Dr. Murphy, administrator of the hospital. The

claim is based on the premise that because it is a public hospital facility "established [by the Commonwealth of Massachusetts and the City of Worcester] for the reception of persons requiring relief during temporary sickness." plaintiff has a right under the United States Constitution to have performed at the hospital a tubal ligation which will make her sterile, and that she is deprived of that right by the hospital's rule "prohibiting any type of consensual sterilization without specific statutory or ordinance authority."

Defendants have moved to dismiss the complaint.

Worcester City Hospital is not a body corporate; therefore, the action against it must be dismissed because it is not a proper party.

The shortest way of dealing with the complaint against the three doctors is to dismiss it on the ground that plaintiff does not have a constitutional right to have the trustees or doctors associated with a public hospital make provision for the performance of a sterilization operation, when the state and city have established the hospital solely "for the reception of persons requiring relief during temporary sickness", [See Mass. St.1953, c. 266, § 2] and when it is not claimed that doctors have performed such an operation at that hospital for some persons but have discriminated against plaintiff.

Complaint dismissed.

## APPENDIX B

United States Court of Appeals
for the First Circuit

No. 71–1206.

Robbie Mae Hathaway,
Plaintiff, Appellant,

v.

Worcester City Hospital et al.,
Defendants, Appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

### MEMORANDUM and ORDER

Entered December 23, 1971

PER CURIAM.

Plaintiff Robbie Mae Hathaway, a resident of the City of Worcester filed an action on April 28, 1971, in the United States District Court, District of Massachusetts, pursuant to 42 U.S.C. § 1983, challenging the Worcester City Hospital's rule prohibiting any type of consensual sterilization. Originally named as defendants in plaintiff's complaint were the Worcester City Hospital and three individuals, Dr. Croce, president of the hospital's board of trustees and chief of its surgical division, Dr. Maher, chief of obstetrics and Dr. Murphy, administrator of the hospital. In an opinion dated June 10, 1971, the district court dismissed the action against the Worcester City Hospital as an improper party and then, reaching the merits of the complaint, dismissed the action against the three individual defendants on the grounds that (1) plaintiff has no constitutional right to force a public hospital to perform a sterilization where the law restricts the hospital to serving only "persons requiring relief during temporary sickness" and (2)

there is no claim that consensual sterilizations have been performed for some persons but not for plaintiff.

From the papers now before us, it appears that plaintiff is a thirty-six year old married woman and the mother of eight children ranging in age from four months to thirteen years. She has been pregnant on a total of twelve occasions and, according to an affidavit filed by Dr. Saul Lerner, the physician who attended her during her last pregnancy, she currently suffers from high blood pressure, an umbilical hernia and varicose veins. It is Dr. Lerner's opinion that all of the ordinary contraceptive methods are either inappropriate or likely to be ineffective in plaintiff's case: her heavy menstrual flow reduces the effectiveness of an intrauterine device and of other approaches, such as the use of jelly or foam, to an unacceptable level; her high non-pregnant blood pressure makes the use of birth control pills unacceptably dangerous. Dr. Lerner has therefore recommended that plaintiff undergo a "therapeutic sterilization" for three separate medical reasons:

"A. Having had twelve pregnancies and eight children she is definitely what we would term a 'grand-multipara'. This means that she has an increased chance of serious complications in any further pregnancy related to a variety of possibilities such as atony of the uterus with postpartum hemorrhage, prolonged labor, and abnormal presentation of the fetus. It has been shown that following five deliveries, the maternal mortality increases with subsequent pregnancies.

B. This patient has a non-pregnant blood pressure of 200/120. I am not sure of the causes of this hypertension in this relatively young girl but if it were related to underlying kidney disease, then certainly this would be further aggravated by subsequent pregnancies. At any rate, a blood pressure of this range would place her at very definite risks of a serious cardiovascular accident with possible loss of life in any future pregnancy.

C. The umbilical hernia is certainly significant in size and it could be reasonably anticipated that any further pregnancy with its increased intra-abdominal pressure would further aggravate this condition."

The primary grounds urged by plaintiff in this court for reversal of the district court judgment affirming the hospital's blanket rule against sterilizations have been constitutional—*viz*, that defendants' refusal to allow consensual therapeutic sterilizations to be performed in the Worcester City Hospital violates her right to marital privacy (citing, *inter alia*, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed. 2d 510 (1965)), jeopardizes her rights to life and liberty in violation of the Fifth and Fourteenth Amendments (again relying primarily on Griswold v. Connecticut, supra), and deprives her of her basic right to choose whether to bear children as guaranteeed by the Fifth, Eighth, Ninth and Fourteenth Amendments, all without the justification of a compelling state interest being served thereby (citing, *inter alia*, Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed. 2d 480 (1960) and McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964)); and that defendants' decision denies her of the equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments (citing, *inter alia*, Brown v. Board of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and Morey v. Doud, 354 U.S. 457, 77 S. Ct. 1344, 1 L.Ed.2d 1485 (1957)).

In deciding not to allow plaintiff to be sterilized in their facility, defendants relied at least in part on a written opinion from the Worcester Assistant City Solicitor who stated that "[t]he Law Department is of the opinion that the legality of such operations is so highly doubtful that no such operations should be permitted." Letter dated June 30,

1970.[1] The principal points of reference for this opinion were Massachusetts statutory and case law. According to the Assistant Solicitor, Chapter 266 of the Mass.Acts of 1953, re-enacting and modifying provisions of the previous law establishing the Worcester City Hospital and the Belmont Hospital, and Chapter 4, Section 1 of the Revised City Ordinances (1951 ed.) may be read as giving the City Hospital the right to perform only "therapeutic" treatments. The Assistant Solicitor further noted that Mass.Gen.Laws Ann. ch. 272, §§ 19, 20 and 21A and Commonwealth v. Baird, 355 Mass. 746, 247 N.E.2d 574 (1969), indicate to him "a public policy in this Commonwealth opposed to birth control." He therefore recommended that no sterilization be permitted at Worcester City Hospital without specific additional authorization in statutory and ordinance form.

Were we confident that this opinion was an accurate statement of settled Massachusetts law, we would proceed to address plaintiff's constitutional challenges, but we are not so sanguine. Chapter 266, §§ 2 & 4, of the 1953 Laws state, in pertinent part, that "[t]he Worcester City Hospital is established for the reception of persons requiring relief during temporary sickness, including paying patients, and of such persons settled in the City of Worcester who by misfortune or poverty may require such relief", and that the members of the board of trustees "shall have the power to make such rules and regulations relating to the administration of Worcester City Hospital . . . as they deem expedient" but that "such rules and regulations shall not be inconsistent with law or with any of the provisions of this act." The phrase "persons requiring temporary relief" also appears in the general statute governing the establishment of city hospitals throughout Massachusetts. M.G.L.A. c. 40 § 5(20), has evidently been carried forward since 1873, and survived the latest amendment to § 5(20) in 1966. To our knowledge, neither the specific nor the general authorizing legislation has been interpreted in respects relevant to the problem before us.

The statute may, we think, plausibly be interpreted in several different ways. "Persons requiring relief during temporary sickness" might, as suggested by the Assistant Solicitor's opinion, be interpreted not to include persons seeking sterilizations. To extend care to such persons would then be beyond the power of the board of trustees as being "inconsistent with . . . this act." Alternatively, the statute might be interpreted to grant to the board of trustees power to define "temporary sickness", in which case, by hypothesis, no definition would be "inconsistent with . . . this act."

Or, "persons requiring relief during temporary sickness" might be viewed as a term of art, intended to reflect the actual practices of Worcester City Hospital or of Massachusetts city hospitals either in 1953 or at the present time. On this interpretation, the phrase might well encompass sterilizations or certain kinds of sterilizations. If so, the trustees might have power nevertheless to refuse to permit categories of operations which for any reasons they deem unsuitable. On the other hand, they may not have this power.

At state court interpretation entitling the plaintiff to a sterilization on state law grounds would make it unnecessary for us to consider whether the plaintiff has a constitutional right to a sterilization. Furthermore, the grounds of a de-

1. This conclusion was based on a memorandum of law prepared by the Assistant City Solicitor in which he stated his conclusion regarding the legality of consensual sterilizations as follows:

"It is concluded that although there appears to be no statute or case law directly on point, certain statutory and ordinance provisions are worded such that they may be interpreted as banning consensual sterilizations, and that the legality of such sterilizations is highly questionable." Memorandum dated June 24, 1970.

cision that she is not entitled under state law to a sterilization would clarify the constitutional issues. For reasons of comity and clarity, then, we think that this is an appropriate case to utilize the certification procedure recently created by the Massachusetts Supreme Judicial Court. Uniform Certification of Questions of Law Rule 3:21 (effective November 1, 1971).

We note, however, that the present record does not indicate what range of services is provided by Worcester City Hospital or by Massachusetts city hospitals generally, either at the present time or in 1953. While we do not imply that these facts should necessarily be considered by the Massachusetts court, we recognize that they may conceivably be relevant to its interpretation of the statute and should thus accompany any certification request.

Accordingly, we remand the case to the district court for the following purposes.

1. For findings, by stipulation or by decision, as to the general range of services provided by Worcester City Hospital and other Massachusetts city hospitals in 1953 and at the present time.

2. For findings, by stipulation or by decision, as to the physical and/or psychological effect which a future pregnancy would be likely to have on Mrs. Hathaway.

3. To certify, with the facts as stated in this opinion and those found pursuant to paragraphs (1) and (2), the following questions:

a. Is a woman who desires a sterilization within the state's definition of "persons requiring relief during temporary sickness?" If so, does this fact give rise to a statutory duty requiring the Worcester City Hospital to make hospital facilities available to such persons on the same terms and subject to the same conditions as other users of the hospital's facilities?

b. Is a woman who desires a sterilization, and on whom a future pregnancy would have the effect it would have on Mrs. Hathaway, within the state's definition of "persons requiring relief during temporary sickness"? If so, does this fact give rise to a statutory duty requiring the Worcester City Hospital to make hospital facilities available to such persons on the same terms and subject to the same conditions as other users of the hospital's facilities?

c. Are there other laws of the Commonwealth or other considerations which the Supreme Judicial Court deems appropriate for the resolution of this case? No costs at this time.

## APPENDIX C

## OPINION

### March 21, 1972

WYZANSKI, District Judge.

Plaintiff, relying upon 42 U.S.C. § 1983, brings this action to compel a municipally-supported hospital in the City of Worcester to provide her with surgical services and care in connection with an operation to sever her fallopian tubes so that she will not longer be capable of bearing a child.

Plaintiff is a married woman who has had eight children in addition to several other pregnancies. She has high blood pressure, a hernia, and an obese condition, which make it dangerous to her life to have additional children. Her physical condition has proved that it is impractical for her to use pills, pessaries, diaphragms, coils, or like intrauterine devices to prevent birth. There is no testimony as to whether it would be ineffective in controlling births if she used the rhythm method, or if her husband used a condom, or if they abstained from sexual relations, or if they limited themselves to sexual practices not involving intercourse.

It appears that the plaintiff is on welfare and has no funds adequate to pay for doctors' fees, nursing care as required, and hospitalization if necessary.

The Worcester City Hospital has never authorized performance upon its premises

of surgery with respect to the fallopian tubes regardless of the recommendation of any doctor or the need of any patient.

There is no showing as to what are the practices followed in hospitals supported from public taxation either in Massachusetts or elsewhere.

It is proved that at least in one community hospital which is privately supported it is common to operate on the fallopian tubes in appropriate cases.

The severing of the fallopian tubes is a surgical operation of only minor risk and indeed probably less dangerous than an appendectomy.

Plaintiff's contention is that, since well-to-do people may in Massachusetts have their fallopian tubes severed in cases where it is medically recommended in order to preserve the woman's life, she, under the equal protection clause, is, as a welfare recipient, entitled to have the city government at public expense provide her with surgical services and care corresponding to that available to the well-to-do.

It is not quite clear that the plaintiff would, if it were medically appropriate, believe that the City of Worcester Hospital had a duty to transplant a heart or a kidney from another person to the plaintiff, or to provide a diet which was prescribed to a wealthy person in the same physical condition as the plaintiff, or to prolong the plaintiff's life as long as the lives of some wealthy women are prolonged by doctors who find the patient able to pay.

It would seem that plaintiff places stress upon the fact that the surgical care which she is seeking is related to the particular risk of childbearing. Of course, it is not the plaintiff's suggestion that her fallopian tubes should be severed so that society may be spared a ninth child to be supported on welfare or that society shall be spared the risk of overpopulation in Worcester. What the plaintiff seems to regard as significant is that her appetite for sexual intercourse is so fundamental and so like an appetite for food that she is being denied equal protection if she is not permitted freely, and without risk, to enjoy such intercourse with her husband, he not wearing the inconvenient condom which conceivably (if that be the right word) may reduce tactile pleasure. Obviously, the plaintiff does not think it appropriate that she should be forced by her condition to abstain from sexual intercourse. It does not seem to her a sufficient constitutional right (however the word constitutional may be defined—that is, in physical or in legal terms) for her to be remitted to the alternative of chastity or sexual embraces short of intercourse.

No doubt, a learned opinion with appropriate references to books of law, medicine, sociology, theology, and indeed all the seven liberal arts, could be written in response to the plaintiff's claim. So far as this court is concerned, it is content to follow the famous formula of Chief Justice White of the Supreme Court of the United States: "To state the question is to answer it."

Complaint dismissed.