Sheldon J. WATTS, Appellant-Plaintiff,

v.

The BOARD OF CURATORS, UNIVERSITY OF MISSOURI, et al., Appellees-Defendants.

No. 73–1824.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1974.

Decided April 9, 1974.

William H. Pickett, Kansas City, Mo., for appellant-plaintiff.

Jackson A. Wright, Columbia, Mo., for appellees-defendants.

Before VAN OOSTERHOUT, Senior Circuit Judge, LAY and ROSS, Circuit Judges.

ROSS, Circuit Judge.

Sheldon J. Watts, a former nontenured assistant professor of the University of Missouri at Kansas City (U.M.K. C.), brought this action under 42 U.S.C. § 1983 alleging a deprivation of his constitutional rights in the nonrenewal of his employment contract. The case was submitted to the district court without a jury and upon stipulated facts and depositions. The district court found that Watts' constitutional rights of procedural due process were not violated and that

the nonrenewal of the employment contract was not based on impermissible reasons under the constitution. Watts v. Board of Curators, University of Missouri, 363 F.Supp. 883 (W.D.Mo.1973). Watts appeals from that decision on the sole ground that the court erred in finding that he was not denied reemployment because of the exercise of a protected constitutional right. We affirm the decision of the district court.

Watts was initially employed as a probationary assistant professor for the academic year 1966–67 and was reemployed under separate one-year contracts thereafter until the last year of his employment during which he was employed pursuant to a terminal contract for the term September 1, 1970, through August 31, 1971. This type of employment at the University of Missouri is called a term appointment. Under the Academic Tenure Regulations, established by the Board of Curators of the University of Missouri, "[h]olders of academic staff positions under term appointments . . . have no rights of permanent or continuous tenure." Those regulations provide for the creation of a University Faculty Committee on Tenure. They also charge the Dean with the duty to recommend each year of an assistant professor's term either that he (1) be reappointed for a term; (2) be reappointed on a continuous appointment; (3) be promoted to an associate professor on a continuous appointment; (4) be reappointed as an assistant professor for a terminal one-year term; or (5) not be reappointed.

■ Pursuant to the recommendation of the Committee on Tenure and Promotion and in concurrence with the recommendation of the Dean of the College of Arts and Sciences and the Chancellor, Watts was reappointed in 1969 as an assistant professor for a terminal one-year term for 1970–71. Accordingly, on October 13, 1969, Watts was informed by the Dean that his appointment for the academic year 1970–71 would be a terminal one in the following correspondence:

I am further obliged to inform you that the Committee have concluded, after serious deliberation and consideration, that your appointment for the academic year 1970–71 should be a terminal appointment. This decision reflects the fact that although your research project has been supported for a considerable length of time, nothing has yet been presented to your peers in the nature of an article or paper. If your manuscript were accepted for publication before January 1971 the committee would reconsider your position in light of your publication record and other matters affecting tenure. I am confident that this decision was not one lightly or frivolously taken and rests upon consideration [sic] which the Committee believe are important to the future growth and development of the Department.

This notification by the Dean did not proffer a constitutionally impermissible basis for the nonreappointment. However, the only correspondence from the Committee on Tenure to the Dean prior to the notification of Watts, that is in the record, contained the following paragraph:

This decision is based on several factors. 1) His research has not resulted in any publication or even reviews by a press even though it has been supported for three years by grants. 2) He has taken no interest in his profession at the state level. He has neither presented a paper at the Missouri Conference nor has he discussed his work with local English scholars. His attitude is that only English historians in England are worthy of consulting perplexed the committee. 3) He objects strongly to teaching world history, even on a once every two or three year basis. In fact, he tried to obtain a "united front" of instructors requested to think about this to refuse as a group. 4) He has displayed disloyalty to his colleagues by distributing a critical review to selected members of the department. 5) He has

taken the position that in confrontation with students that they are always right and on one occasion suggested that the University "might need burning down." (This might have been in jest, but no one there thought so.) All of these factors lead the committee to conclude that he should not be offered tenure. If the book is published during 1970–71 and he seems drastically changed after his leave, the committee might reconsider. However, to protect the department and university the leave with a terminal contract seems the best approach.

Watts argues that there is nothing to suggest that the officials of the University and the Board of Curators do anything other than rubber stamp the recommendation of the Committee and that, since some of the above factors in the Committee's nonreappointment recommendations are protected by the first amendment, his nonrenewal was constitutionally impermissible.

After the receipt of this memorandum from the Committee, Watts was notified by the Dean of his terminal appointment as hereinbefore set forth. Watts accepted this decision as "fair" and went to England under a partial grant from the University to finish his manuscript. On December 9, 1970, Watts wrote a letter to the Chairman of the Tenure Committee and attached thereto a copy of a contract with Coronado Press as proof that he was then in compliance with the condition set forth in the Dean's letter to Watts of October 13, 1969. However, on December 9, 1970, Watts had actually completed only three of nine chapters of the book.

After a conference between Watts and the Dean concerning the unfinished manuscript, the Dean wrote to the Chairman of the Tenure Committee on March 24, 1971, indicating that on the basis of the Dean's reading of the completed portion of the manuscript and an article which had been published, "it will be impossible to fault him with respect to his scholarship." The letter contained a statement by the Dean that "there is not sufficient objective evidence to justify the termination of Professor Watts and I believe that your committee's recommendation to advise it in the light of recent evidence would not be in the best interests of the Department."

Thereafter the Committee met again and unanimously voted not to modify its recommendation. Another written report was sent by the Chairman of the Committee to the Dean on March 29, 1971, reaffirming the Committee's recommendation not to offer Watts a new contract.[1] It specified as the reasons for its recommendation that Watts had failed to finish his manuscript by the appointed time; that he had failed to participate in conferences relating to his specialized academic interest, including the annual state meeting in Columbia, Missouri; that he was absent at the time of registration in January 1971; and that he rebelled against extra teaching assignments made by the head of the department. The fourth and fifth items set forth in the Committee's earlier report were not even mentioned in this later letter to the Dean. The statements in this report are corroborated by the deposition testimony

---

1. This letter is not included in the appendix or attached as an exhibit to the pretrial order and stipulation. It is attached as an exhibit to the deposition of Lawrence Larsen. However, Paragraph V of that pretrial order and stipulation provides as follows:

The parties do hereby stipulate, agree and do hereby submit this case on its merits to the Court for a legal determination on the merits of legal liability, if any, based upon evidentiary facts and exhibits contain-

ed in this pre-trial order No. 2 and evidentiary facts contained in the records of the court *including the depositions of the parties hereto* and the parties do stipulate to a continuance of the matter for a hearing on the issue of damages if the court should determine legal liability, if any. (Emphasis supplied.)

We conclude that the exhibit, used by counsel for Watts in his examination of Larsen, is properly before the Court.

of several of the defendants. The Dean concurred in this decision of the Committee. Watts was then given the opportunity to meet with the Committee and discuss the reasons for the decision, but he failed to attend the meeting which had been set for May 11, 1971. On May 10, 1971, Watts wrote to the Dean as follows:

> If you find you are able to give me reasons for your decision in writing, I would appreciate it. I refuse to have any more to do with this business. I forgive you.

A full written report was made by the Dean to the Chancellor on May 13, 1971. This report stated that "good teaching is not an issue in this case; neither the department's committee nor the administration question the fact that these gentlemen are adequate teachers. The decision was based on the failure of these gentlemen to fulfill certain contractual agreements within the time initially stipulated."

The Chancellor reviewed the case and concurred in the recommendation.

Judge Williams found that "[t]he primary and basic reason for the recommendation of the Committee on Tenure and Promotion for the University to issue a terminal contract to Plaintiff was the fact that though Plaintiff had received support from the University to enable him to complete and publish a book, he had not met his commitment to do so." He cited as an additional reason Watts' "attitude of unwillingness to teach world history." He referred to the other factors mentioned in the memo of October 7, 1969, and determined that they were "minor and alone would not have been considered by Committee members as sufficient to warrant a recommendation of a terminal contract."

After a careful examination of the record, including the exhibits and the depositions which were taken, we must conclude that these findings were not clearly erroneous. Indeed they seem to be the only logical findings that could be made as to the initial determination of the defendants to award Watts only a terminal contract in October of 1969.

However, our view of the record is that this determination was only a necessary prelude to the actual decision in March of 1971 to permit the terminal contract to expire without offering Watts another contract.

In a letter to Watts dated July 23, 1970, the Dean confirmed the statement made in his letter of October 13, 1969, *supra,* as follows:

> You will also recall that the Committee signified its willingness to reconsider its recommendation if your progress relative to your present research program and other considerations affecting the criteria for tenure and promotions seemed to warrant it. This willingness still exists and is confirmed by this memorandum.

In December of 1970, Watts asked the Committee to reconsider his appointment on the basis of a publishing agreement for his book which he submitted, and on the basis of the forthcoming publication of an article in an academic journal. The Dean had an interview with Watts and thereafter asked the Committee to reconsider its decision. The Committee did reconsider its earlier recommendation and made its final decision as evidenced by the letter from the Chairman of the Committee to the Dean on March 29, 1971, and as shown by the depositions of the defendants.

The Dean concurred in the recommendation and submitted his report to the Chancellor who then failed to take any additional steps to give Watts a new contract.

■ The important factor here is that the *final* decision not to give Watts a new contract was made in the spring of 1971 after a thorough reconsideration of the matter by the Committee and after the Committee had decided, for constitutionally permissible reasons, to recommend that no new contract be tendered. The memo of October 7, 1969, which Watts claims cites two constitutionally impermissible reasons for the

decision to offer him a terminal contract, is not conclusive for two reasons. First, the alleged constitutionally impermissible reasons were not the primary reasons for the determination and were only incidental to the principal reason. Secondly, the decision was a tentative one subject to later review if Watts' manuscript was accepted for publication before January 1971. He did not finish his manuscript and publish his book within the prescribed time, and after a full reconsideration, the Chancellor, upon the written recommendations of the Committee and the Dean, did not recommend that the Board of Curators offer Watts a new contract.

■ It is now almost axiomatic that teachers do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Accordingly, a state may not deny a valuable governmental benefit "to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). Yet, a state has a legitimate interest in the fitness and competence of its teachers. Shelton v. Tucker, 364 U.S. 479, 485, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). There is no requirement in the constitution that a teacher's classroom conduct be the sole basis for determining his fitness. Fitness for teaching depends on a broad range of factors. Beilan v. Board of Education, 357 U.S. 399, 406, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958). A college has a right to expect a teacher to follow instructions and to work cooperatively and harmoniously with the administration. It is the burden of the teacher to show that the decision not to renew a contract was in fact a pretext, and that the decision was actually based on the Board's disapproval of the exercise of a constitutionally protected right by the teacher. *Cf.* McDonnell Douglas Corp.

v. Green, 411 U.S. 792, 803–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ In this case, Watts has failed to demonstrate that the actual nonrenewal decision, made by those charged with the authority to render such binding determinations, was based upon anything other than the permissible reasons that he had failed in his professional and employment commitment to publish a book after having been afforded time and monetary support by the U.M.K.C. for that purpose and his reluctance to teach world history as directed. The result we reach in this case accords with previous decisions of the Supreme Court and this circuit. In Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court recognized that in evaluating the conflicting claims of first amendment protection and the need for orderly school administration:

> The problem . . . is to arrive at a balance between the interests of the teacher . . . and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* at 568, 88 S.Ct. at 1735.

Likewise this result is consistent with our decision in Gieringer v. Center School District No. 58, 477 F.2d 1164 (8th Cir. 1973). There we considered a teacher discharge which the School Board arued rested upon an entire history of the teacher's inability to get along with his superiors rather than upon a report that the teacher had made to the Teachers' Association. We held that the record did not support that argument and that it was clear from the record that the report served as the catalyst without which no discharge would have occurred. *Id.* at 1166. However, in a footnote we noted that:

> Even assuming Gieringer's report may have been only partially a factor in his dismissal, if that report was protected activity, then the dismissal was still constitutionally impermissible.

*Id.* at 1166, n.2. We do not reach that question here since we have determined that the final decision not to renew Watts' contract was not shown to have been based upon an impermissible reason at all.

For the reasons hereinbefore expressed, the judgment of the district court is affirmed.