G. William ORR and Marvin L.
Dietrich, Plaintiffs,

v.

Robert KOEFOOT, Individually and as a
member of the Board of Regents,
et al., Defendants.

Civ. No. 73-L-286.

United States District Court,
D. Nebraska.

June 12, 1974.

As Amended Aug. 21, 1974.

Lawrence I. Batt, Omaha, Neb., for plaintiffs.

Flavel A. Wright, of Cline, Williams, Wright, Johnson & Oldfather, Lincoln, Neb., for defendants.

## MEMORANDUM

RICHARD E. ROBINSON, Senior District Judge.

This matter comes before the Court after having been tried to the Court without a jury. The jurisdiction of this Court is based upon 28 U.S.C. §§ 1343 and 1331. The plaintiffs, alleging that their constitutional rights have been violated by the members of the Board of Regents of the University of Nebraska, seek redress under 42 U.S.C. § 1983.

## FINDINGS OF FACT

The College of Medicine of the University of Nebraska has established a Medical Center at Omaha, Nebraska, for the purpose of providing clinical medical education to medical students, interns and residents, and continuing medical education to practicing physicians in the State of Nebraska. As a part of its function the Medical Center also, of course, performs valuable medical services in the Omaha community and the State of Nebraska by providing patient care, consultation and research.

The plaintiffs, Drs. Orr and Dietrich, are physicians and instructors with the College of Medicine on the staff of the University Medical Center. Both plaintiffs specialize in obstetrics and gynecology. Dr. Orr is a tenured professor, Dr. Dietrich is, untenured. Prior to July 14, 1973, both Dr. Orr and Dr. Dietrich were "full-time" clinical faculty members on the University staff. As full-time faculty members the plaintiffs were not permitted to practice medicine outside of the University Medical Center and its affiliated hospitals, except under limited circumstances. Other "part-time" or "volunteer" faculty members were, however, permitted to engage in outside private practice, while maintaining a teaching relationship with the Medical Center.

Prior to January 22, 1973, the University Medical Center, in compliance with the, then existing, Nebraska law, Pt. I, ch. 6, § 39 [1873] Neb.Laws; Pt. I, ch. 2, § 6 [1873] Neb.Laws, permitted

abortions to be performed only when that procedure was "necessary to preserve the life of the mother." However, on the above-mentioned date the Supreme Court of the United States issued its decisions in the cases of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L. Ed.2d 147 [1973], and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 [1973], substantially liberalizing the law of abortion, and making the decision to have an abortion a private matter between the expectant mother and her consulting physician for at least the first trimester of pregnancy, Roe v. Wade, *supra* at 163. The former Nebraska "abortion" statutes were, subsequently declared unconstitutional, Doe v. Exon, Civil No. 71–L–199 [D.Neb., filed Apr. 22, 1971].

Prior to the Court's decisions in *Roe* and *Doe,* the number of abortions performed at the Medical Center to preserve the life of the mother were limited by the administrators of the Hospital and the Ob/Gyn Department.[1] This had the effect of permitting approximately fifteen [15] abortions per week. The limitation was felt necessary due to a shortage of qualified staff personnel to handle the volume of patients admitted to the Ob/Gyn Department.

After January 22, 1973, abortions were performed at the Medical Center according to the medical needs of the expectant woman upon the advice and counsel of her physician, in compliance with the guidelines established by the Court in *Roe.* During this period the demand for abortions rose,[2] and the limitation of fifteen [15] abortions per week was abandoned. A subsequent limitation was, however, imposed which permitted approximately thirty [30] abortions per week. The additional workload on the Ob/Gyn Department was met by improving the system of health care delivery at the Medical Center.

Aside from the students, interns, residents and practicing physicians who chose to be educated in the abortion procedures, the plaintiffs were the only two physicians on the staff of the Ob/Gyn Department who performed abortions other than those required to preserve the life and health of the mother.

On May 18th, a regularly scheduled meeting of the University Board of Regents was held. At that meeting the subject of the Medical Center's policy toward abortion was raised and each of the Regents had an opportunity to express his views. It was decided at that meeting that a special meeting of the Board of Regents should be held on June 7, 1973, to obtain more information on the abortion question.

At the June 7th meeting the Regents heard and questioned the Chancellor of the Medical Center and the Chairman of the Ob/Gyn Department. At the conclusion of the meeting the Board passed the following resolution:

"[N]o abortion except to protect the health and life of the mother or to meet the minimum requirements of a conservative medical teaching program shall be performed on or prescribed for any woman on the University of Nebraska premises. . . . And, that such University shall not admit any patient for the purpose of performing an abortion nor allow the performance of an abortion therein except as provided above and that the University of Nebraska . . . shall inform any person requesting an abortion of its policy not to participate in abortion procedures except as

---

1. According to the testimony of Dr. Messer, Chairman of the Ob/Gyn Department, on or about January of 1973, he arbitrarily limited the number of surgical abortions performed in his department to twelve [12] per week. At that time the Medical Center was also performing approximately three [3] to four [4] non-surgical abortions per week.

2. The demand for abortions in Nebraska has been estimated at between five thousand [5000] to seven thousand [7000] per year. University of Nebraska Board of Regents Official Minutes [June 7, 1973].

provided in this motion and that the Chancellor of the University of Nebraska Medical Center submit guidelines to this Board by June 23, 1973, for limiting abortions to the extent herein required."

University of Nebraska Board of Regents Official Minutes [June 7, 1973].

The Chancellor concluded that the "minimum requirements of a conservative medical teaching program" called for fifteen [15] abortions per week. The Chancellor's suggested limitation was, strictly speaking, only a limitation on non-therapeutic abortions. If a sixteenth [16th] therapeutic abortion was required in a given week, the Sixteenth [16th] procedure would be permitted under the recommended policy. If, however, Fifteen [15] therapeutic and non-therapeutic abortions had already been performed in a given week, admission to the University Medical Center would not be granted for the performance of an additional non-therapeutic abortion.

At the regularly scheduled meeting of the Board of Regents on June 23, 1973, the Chancellor's recommended formula was approved. Additionally, the Board of Regents passed a resolution providing that any full-time member of the Ob/Gyn Department who performed abortions outside of the Medical Center would be "subject to termination procedures" and such act would "be cause for termination". Furthermore, a special fund under the direction of a Committee appointed by the Chancellor, subject to the approval of the Board, was set up to handle professional fees obtained from the performance of abortions at the Medical Center. The effect of these additional resolutions is disputed, since it is uncertain whether or not these resolutions altered the terms of the, then, existing employment contracts between the plaintiffs and the Board of Regents.

As a result of the resolutions of June 7th and 23rd the plaintiffs sought a change in employment status from "geographic" full-time to 75% part-time.[3] At the July 14th meeting of the Board of Regents their applications for permanent change in status, approved by the Chancellor, the Dean of the College of Medicine, and the Chairman of their department, were presented to the Board. Their applications were approved, however, their change in status was granted only for the temporary period of Ninety [90] days.

In early August, 1973, the plaintiffs opened their private obstetric and gynecological clinic. At their private clinic the plaintiffs provided the full spectrum of Ob/Gyn services to their patients, including the performance of non-therapeutic abortions. In the months subsequent to the establishment of this clinic the number of abortion patients seeking admission to the Medical Center declined below the Fifteen [15] per week which was deemed necessary to meet "the minimum requirements of a conservative medical teaching program."

On October 12, 1973, at the regular meeting of the Board of Regents the plaintiffs renewed their request for permanent part-time employment status. At this time they were again supported in their application by the Chancellor, the Dean, and the Chairman of their department. Furthermore, the Board was informed that the plaintiffs had adequately and professionally discharged their obligation to the University throughout the period of their part-time status. An executive session was held by the Board after which the plaintiffs' application was denied, thereby returning them to full-time employment status. This, of course, had the effect of prohibiting them from practicing medicine outside of the University Center and affili-

---

3. The term "geographic" full-time is defined in The University of Nebraska Medical Service Plan [March 5, 1971] as a full-time instructor who:
   will confine his diagnosis and care of patients to the University of Nebraska Medi-

cal Center except as they may relate to teaching, patient care and/or other academic responsibilities at other health service facilities with the approval of the Chairman of his respective department and the Dean of the College of Medicine.

ated hospitals. As a result of this Board action the plaintiffs filed this suit and obtained a temporary restraining order against the Board preserving the status quo and prohibiting the Board from discharging the plaintiffs from employment pending the present action.

As an additional finding of fact, this Court finds that the plaintiffs are highly competent and qualified specialists in the field of obstetrics and gynecology with expertise in the area of high risk pregnancy and interuterine transfusion. Such expertise is, apparently, unique to the State of Nebraska. The Court hastens to add that, though these plaintiffs have been subjected to a good deal of adverse publicity and reprisal because of their stand on the abortion issue, the uncontroverted evidence in this case establishes that these plaintiffs are competent and professional medical practitioners of unimpeached ethics.

## ISSUES

The plaintiffs filed this § 1983 action alleging: [1] That the resolution of the Board of Regents of June 7th limiting the number of abortions performed at the Medical Center to the number required to preserve the life and health of the mother and the minimum number required to support a conservative medical teaching program, violated the plaintiffs' constitutional right to practice their profession; [2] That the Board's resolution of June 23rd prohibiting full-time staff personnel from performing abortions outside of the Medical Center and establishing a separate fund for abortion fees, violated their constitutional rights to practice medicine and earn financial reward therefrom; [3] That the Board's action of July 14th denying the plaintiffs' application for a change in status from permanent full-time to *permanent* part-time status, was a denial of their constitutional right to equal protection of the

law; and [4] That the Board's refusal to grant a similar application on October 12th also denied these plaintiffs equal protection of the law.

By way of counter-claim, the defendants seek additional declaratory relief. They raise the following issues: [1] Is the Board of Regents obligated to permit the performance of abortions at the University Medical Center? [2] May the Board limit the number of non-therapeutic abortions to that number required to meet the minimum standards of a conservative medical teaching program? [3] Are Fifteen [15] abortions per week consistent with the needs of a conservative medical teaching program? [4] Have the plaintiffs breached their employment contracts with the University such as to allow the Board to terminate their employment? and [5] is the Board obligated to renew the contract of plaintiff, Dr. Dietrich, who is untenured?[4]

Since several of the claims and counterclaims overlap, the Court will discuss the issues in the context of the various Board resolutions passed on June 7th, June 23rd, July 14th, and October 12th, 1973.

## THE RESOLUTION OF JUNE SEVENTH

The plaintiffs have challenged the constitutionality of the Board's resolution of June 7, 1973, limiting the number of patients admitted for the performance of abortions at the Medical Center to the number required

"[T]o protect the health and life of the mother to meet the minimum requirements of a conservative medical teaching program. . . ."

University of Nebraska Board of Regents Official Minutes [June 7, 1973].

The defendants, in their answer and counterclaims deny that the June 7th resolution violates the federal Constitution and ask this Court to declare

---

4. Because the abortion issue is highly controversial it is, perhaps, appropriate for the Court to point out that neither party has challenged the University's policy of permitting students to be educated in abortion techniques on a strictly voluntary basis.

whether the Board of Regents is obligated to permit the performance of any abortions at the University Medical Center.

Section 10, Article VII of the Constitution of the State of Nebraska invests the Board of Regents of the University of Nebraska with the general government of the University. Pursuant to that authority, Neb.Rev.Stat., 85–172, Reissue of 1971, provides in pertinent part:

> "It shall be the duty of the Board of Regents . . . to prescribe the conditions and the rates to be charged for the admission of all patients to the [University] hospital and their discharge therefrom, and to take all other needful measures to promote the efficiency of said hospital. . . ."

Consequently, the Board is vested with a broad authority to establish admission policies at the University Medical Center. All administrative authority, however, is limited to some degree by the Constitutional rights of the parties subjected to regulation. This Court must then first define the limitations which the Constitution placed upon the discretion of the Board of Regents in setting curriculum policy with respect to abortion. The obvious starting point in making this determination is with the recent case of Roe v. Wade, *supra.*

In that case the Court said:

> "Where certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest,' and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." [Citations omitted.]

*Id.* 410 U.S. at 155.

In the *Roe* case the Court found that a pregnant woman's constitutional right to personal privacy encompassed the decision whether or not to terminate a pregnancy. Consequently, the State could not regulate that decision unless it could demonstrate that regulation was required by some "compelling state interest".

Though the right to personal privacy obviously belongs to the woman, the *Roe* opinion recognized the physician's inherent involvement in the abortion decision. *Id.* at 165. The private physician's close involvement in that decision has since been held sufficient to confer standing upon him to challenge the abortion policy of a government owned hospital. Nyberg v. City of Virginia, 495 F.2d 1342, [8th Cir., 1974]; Watkins v. Mercy Medical Center, 364 F.Supp. 799 [D.Idaho 1973].

In light of the *Roe* and *Doe* decisions, the Eighth Circuit Court of Appeals has recently held in Nyberg v. City Virginia, *supra,* that a government owned general hospital may not develop a policy which regulates the performance of abortions at its facilities unless the regulation takes cognizance of the tripartite test developed in the *Roe* opinion.

The *Nyberg* Court appeared to base its holding upon the fact that the hospital in that case was a *public* hospital providing *general* health care facilities *without significant restriction* upon the type of patients admitted or procedures employed in their treatment.[5] The Court stated that:

> "[O]nce the state has undertaken to provide general short-term hospital care . . . it may not constitu-

---

5. While the *Nyberg* opinion does not expressly characterize the hospital involved, nor delineate its reasons for holding that the hospital could not regulate abortion beyond the holding in *Roe*, it may be implied from the Court's heavy reliance upon the case of Hathaway v. Worcester City Hospital, 475 F.2d 701 [1st Cir. 1973], that the Court decision rested, at least in part, upon the character of the facility involved. In *Hatha-*

*way,* the Court carefully considered the nature of the facility involved and its role and responsibilities in the community, and concluded:

> "the range of services to be provided by the hospital is to be determined by the hospital board of trustees, limited only by inconsistent provisions of law and the hospital's broad general mandate."

tionally draw the line at medically indistinguishable surgical procedures that impinge on fundamental rights."

*Id.* 495 F.2d at page 1346. The Court reasoned that it was inconsistent to prohibit the state from regulating the abortion decision, but to permit it to withhold necessary public facilities for the performance of abortion procedures. *Id.* at page 1346. Where, however, the facility in question does not provide general health care it may be argued that the State should not have to demonstrate a compelling interest in order to regulate abortion. In *Nyberg*, for example, the Court refrained from finding an affirmative duty on the State to provide abortion facilities.[6] It merely held that once the hospital had undertaken to provide general health care, it could not arbitrarily prohibit its facilities from being used for abortion in the absence of some compelling state interest in regulation. In the present case, the University Medical Center was not established and does not function merely as a general public hospital. Its principal mission is to provide clinical medical education to students [including nurses and technicians], interns, residents and private practitioners. It, therefore, becomes necessary to determine whether this facility is sufficiently similar to a general public hospital to require the application of the rule of the *Nyberg* case. If the Medical Center does provide general health care service to the public according to the *health needs* of the community, to any substantial degree, then it may, in this case, as in *Nyberg, supra,* 495 F.2d at 1346, be

"A nonsequitur to say that the abortion decision and its effectuation is an election to be made by the physician and his patient without interference by the state and then allow the state, through its public hospitals, to effectively bar the physician from using state facilities to perform the operation."[7]

In *Nyberg* the hospital presumably accepted or rejected patients according to the patient's needs and the physical limitation of its facilities. In the present case, the admissions policy of the Medical Center indicates that:

"The number and type of patients accepted for care in the Hospital and Clinics shall be determined by the needs of the various educational and research programs.

6. Even though a state owned facility might grossly be described as a hospital, it does not necessarily follow that that facility must permit the performance of abortions. For example, many state owned medical facilities provide medical care of a specialized type i. e., mental institutions, childrens hospitals, tuberculosis sanitariums, etc. Such facilities have a statutory goal or purpose which may preclude the requirement that they admit patients for the performance of abortions. A regulation prohibiting abortion at such facilities might well be valid and not necessitate that this Court find a "compelling" reason for the prohibition since the admissions policy of the institutions negate any reasonable public expectation that general health services are available there.

7. This Court has no intention to interject itself into the curriculum policies of the University of Nebraska, College of Medicine.

Though the Supreme Court has, on occasion, found a school's curriculum to be constitutionally infirm, Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 [1968]; Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 [1923], it is apparent that the Court regards such an intrusion to be a serious matter and one which should not be lightly taken. In *Epperson* the Court said:

"For purposes of the present case, we need not re-enter the difficult terrain which the Court, in 1923, traversed without apparent misgivings. We need not take advantage of the broad premise which the Court's decision in *Meyer* furnishes, nor need we explore the implications of that decision in terms of the justifiability of the multitude of the controversies that beset our campuses today." 393 U.S. at pages 105–106.

In this case, the Court also finds narrower grounds upon which to base its decision.

"[2] Indigent or needy patients . . . may be admitted upon receipt . . . of written application.

. . .

"[4] In addition . . . the Dean of the College of Medicine shall have the power in his discretion . . . to accept patients who are able to pay for the full or partial cost of their care. . . . when the treatment and care of such patients may serve to further the educational program of the College of Medicine.

"[5] The admission of patients to the Hospital will be limited necessarily to the number of unoccupied beds on the service to be entered.

"[6] The Dean of the College of Medicine is empowered to refuse admission to such cases as cannot in his judgment . . . further the educational program of the College of Medicine."

By-Laws and Rules of the Board of Regents of the University of Nebraska. [February 5, 1965] at 62 et seq. In addition, the Medical Center accepts patients referred to it by other private practitioners when the treatment of such patients will serve the educational goals of the University. *Id.* at page 64.

The Medical Service Plan of the University Medical Center provides that:

"Medical education and the medical care of patients are closely and irrevocably intertwined. This concept is inherent in the primary missions of the University of Nebraska College of Medicine: [1] Instruction and training of health personnel. [2] Health related research. [3] The provision of health service primarily for the benefit of the people of Nebraska."

The University of Nebraska Medical Service Plan. [March 5, 1971] at page 1.

It is obvious that the admissions policy of the University Medical Center reflects the principal goals of the College of Medicine, which are education and research. However, as a necessary and inevitable adjunct to those functions, the Center provides valuable medical services to its community and to the State. Every time the educational or research goals of the Medical Center are advanced, a corresponding medical service is provided to some member of the public. Indeed, without the participation of the general public the educational and research goals of the Center could not be realized. Consequently, when a patient presents himself for admission, the determination of whether or not he will be admitted is made according to the needs of the patient within the framework of the educational mission of the University. He is denied admission only when it is concluded that his treatment will not further the goal of imparting the maximum educational experience to the student within the physical and other limitations of the University.[8] The ailment for which the patient seeks treatment is considered only within these general guidelines. Furthermore, since the Medical Center draws exclusively upon the general public in order to obtain the number and diverse type of patients nec-

---

8. At trial, the Chancellor of the Medical Center indicated that he would not have imposed an additional limitation on the number of abortion procedures in June of 1973 except for the fact that the Board of Regents required such limitation. It was also brought out at trial and in several of the exhibits that no limitation has ever been imposed on any surgical procedure except abortion, within the recollection of any witness. While it may be presumptuous to assume from that, that all medically qualified patients who seek admission to the Medical Center are granted admission, this evidence strongly indicates that each patient who presents himself at the Medical Center is admitted on the basis of his need, the physical limitations of the Center facilities and whether or not his treatment will further the educational function of the University. This strongly suggests to the Court that the policy of the University is to strive for the maximum educational experience for the student within the physical and other limitations of the Center.

essary to carry on its educational mission, the functioning of the Center inevitably responds to the medical needs represented in its community. Consequently, when the Medical Center establishes a policy concerning the provision of non-therapeutic abortion that policy touches its community and infringes upon the personal privacy rights of the pregnant women in its community to the same degree as any other state run hospital providing general medical services to the public except that the University Hospital may not only reject patients who overtax its physical resources but also those patients who do not benefit the educational and research goals of the College of Medicine.[9]

■ Consequently, even though the primary function of the Center is educational, it is inevitably engaged in providing a state run service to the community. In doing so it must not unconstitutionally infringe upon the fundamental rights of the people whom it serves.[10] Before it can regulate abortion, or the abortion decision at its facility it must comply with the law as stated in the *Roe* and *Nyberg* decisions. In both cases, it was held that the state could regulate abortion only if the regulation could be demonstrated to serve some "compelling state interest." Since the regulation at issue in this case is obviously more stringent than the tripartite test developed in *Roe*, the validity of this regulation rests upon whether or not there exists some interest which is sufficient to justify the more stringent requirements of the June 7th resolution. If there does exist some interest which is sufficiently compelling to permit this more stringent regulation, then, because the ᾽fundamental right to personal privacy is at issue, the Court must determine whether the policy of the Board is

"narrowly drawn to express only the legitimate state interest at stake."

*Roe* v. *Wade*, *supra*, 410 U.S. at page 155.

The Supreme Court, in *Roe* identified two interests which the state might assert as sufficiently "compelling" to permit the regulation of the abortion decision. Because the two interests were different in nature, each reached the "compelling" point at a different stage in the course of the pregnancy.

The State's interest in the preservation of maternal health reached the "compelling point" at approximately the end of the first trimester because it was at that point that abortion became a greater threat to maternal health than full-term childbirth. *Id.* at page 163.

The State's interest in preserving "potential life" reached the "compelling point" at approximately the end of the second trimester because it was at that point that the fetus became viable. *Id.*

---

9. In Tinker v. Des Moines School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 [1969] the Court held that even a state goal as important as education could not justify an intrusion upon "fundamental" rights which was broader than necessary to assure that the educational goal was achieved, and even though, in this case, the "fundamental" right involved belongs to persons outside the educational community, the state may not so regulate its functions as to infringe upon the rights of those with whom it comes into contact. Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 [FiledApril 29, 1974].

10. As this Court noted, *supra* note 7, it would not ordinarily intrude upon the Regents' power to set curriculum policy at the University of Nebraska so long as that policy was rationally related to the University's functions. What requires the Regents to demonstrate a "compelling state interest" in this case, however, is the fact that they are also providing general health services to the community. In doing so, they have established an admissions policy which may discriminate between patients seeking an abortion and patients seeking other types of medical treatment. Since the people in the community, who look to the Medical Center for medical treatment have a "fundamental right" to privacy in the abortion decision, the Center may not impede that right unless there is a "compelling" reason for doing so. *See* DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 [Filed, Apr. 23, 1974] [Douglas, J. dissent].

In this case, because of the nature of the medical facility involved, and the special responsibility of these defendants to the people of Nebraska, the Court finds itself confronted with a third type of State interest which, in its opinion, is sufficiently compelling to justify an intrusion upon the privacy of the abortion decision.

The State of Nebraska has an undeniable interest in maintaining the quality of the medical services provided by its physicians. One of the best means of accomplishing this goal is to see that physicians trained in the state medical colleges receive a well rounded educational experience. It was for the purpose of providing this experience that the University Medical Center was established. The principal responsibility of these defendants is to establish a policy for the Medical Center which will facilitate and lead to the achievement of that goal. In discharging that responsibility the defendants have an important duty as elected officials to establish and maintain a balanced curriculum at the Medical Center. To the degree that the balanced curriculum depends upon regulations or limitation of abortions at the University Medical Center, these defendants have not only the right, but the solemn duty to formulate regulations designed to, on the one hand, maintain a proper balance in the curriculum of the Medical Center, and, on the other, to intrude upon personal privacy rights only so far as is necessary to assure the fulfillment of its goals.

■ As such, this Court finds that the Board of Regents of the University of Nebraska may impose such reasonable regulations and limitations on the performance of abortion at the University Medical Center as are necessary to assure that the curriculum of the University Medical Center maintains a proper balance among the various medical skills taught there, to assure a proper distribution of University funds among the various departments of the Medical Center, and to assure that the educational and research goals of the University are

served by each patient admitted to the Medical Center. Bagley v. Romney, No. C–50–73 [D.Utah, filed March 20, 1973] unreported. Less regulation would cause the principal goals of the University Medical Center to be compromised. More regulation would result in the unwarranted loss of cherished "fundamental rights".

It thus becomes necessary to judge the Board's action of June 7th against the background of this rule. The June 7th resolution limits abortions to those required

"[T]o protect the health and life of the mother or to meet the minimum requirements of a conservative medical teaching program. . . ."

University of Nebraska Board of Regents Official Minutes [June 7, 1973].

■ It has been concluded that fifteen [15] abortions per week meets this *minimum* requirement. However, no other medical procedure performed at the Medical Center is limited to the number required to meet the *minimum* requirements of education. Indeed, in light of the reputation of this facility and its graduates throughout the State and Nation, this Court is certain that the general educational policy of the Medical Center strives to impart the maximum educational experience to its students within the physical, financial and other limitations of the Center. The record is void of any reason why the maximum number of non-therapeutic abortions should be set at the *minimum* number required for education, while all other medical procedures performed at the Center are limited only by another, broader, educational policy. That is not to say that what this Court regards as a "broad" curriculum must be followed at the Medical Center. That is a question of policy to be answered in a reasonable and unarbitrary manner by the experts in medicine and education. However, when the admissions policy of the University Hospital intrudes upon the fundamental right to personal privacy, the University must be prepared to demon-

strate that that intrusion is justified by a compelling state interest. And where, as here, a University Hospital which is providing substantial medical services to its community, has established an admissions policy which treats "indistinguishable" medical procedures differently, thereby intruding upon a fundamental constitutional right, it carries the burden of demonstrating that the educational and research missions of the University require this diverse admissions policy. Other than the fact that the issue of abortion is highly controversial this Court has been shown no reason why the educational and research goals of the University Center require that the number of abortion patients be limited to meet only the minimum requirements of education while every other medical procedure practiced there is limited only by the requirement that it further the educational or research function of the University and promote a balanced curriculum and division of resources at the Center.[11] As the Court noted in *Nyberg, supra* at page 1346:

"The ban on all abortions other than those to save the mother's life serves neither the hospital nor the state."

it is in this case also obvious that limiting the number of abortions to the number required to meet the minimum requirements of education serves neither the State nor the goals of the University, while on the other hand, it intrudes upon basic "fundamental" rights.[12]

The defendants, however, refer the Court to Neb.Rev.Stat., 28–4, 156 cum. supp. 1973, which provides:

"No hospital, clinic, institution, or any other facility in this state shall be required to admit any patient for the purpose of performing an abortion nor required to allow the performance of an abortion therein: Provided, that the hospital, clinic, institution, or any other facility shall inform the patient of its policy not to participate in abortion procedures. No cause of action shall arise against any hospital, clinic, institution, or any other facility for refusing to perform or allow an abortion."

and claim that the statute entitles the Board not only to limit the number of abortions, but to prohibit abortions at the Center if they so desire. Whatever effect this statute might have,[13] it is clear, in light of *Nyberg* that a public hospital providing general medical treatment in its community may not, in the absence of a compelling reason, limit or prohibit the performance of abortions and thereby draw a distinction between

11. There is evidence in the record to indicate that one of the reasons for the limitation of abortions at the Medical Center may have been because the Regents felt that a greater number of abortions were being performed at the Center than were required to educate students in the various abortion techniques. This would suggest that the Regents may have been acting to provide "a balanced curriculum and division of resources at the Center." Despite the fact that the Regents were not presented with expert evidence of that fact, this Court would not ordinarily upset these findings. However, the fact that abortions were limited to the *minimum* required for education rather than the "maximum", or a "reasonable number" required for education belies the fact that the Regents' only concern was with a balanced curriculum.

12. Rarely is education acquired as a blinding vision which suddenly qualifies the student as an expert in a given field. Most education is acquired slowly and expertise is obtained in varying degrees of competency as higher levels of experience and instruction are reached. Consequently, when the maximum amount of educational experience is limited to the minimum required for basic instruction it is clear that no educational function is being served when there is opportunity to impart greater expertise without intrusion upon other educational pursuits.

13. Though the Eighth Circuit Court of Appeals has recently prohibited a public hospital from adopting a restrictive policy toward non-therapeutic abortions, Nyberg v. City of Virginia, 495 F.2d 1342 [8th Cir. 1974] it is not altogether clear that Neb.Rev.Stat. 28–4, 156 is constitutionally infirm in light of Doe v. Bellin Memorial Hospital, 479 F.2d 756 [7th Cir. 1973], and Watkins v. Mercy Medical Center, 364 F.Supp. 799 [D.Idaho 1973].

abortion and other "medically indistinguishable surgical procedure," since to do so impinges on fundamental rights. Nyberg v. City of Virginia, *supra* 495 F.2d at page 1346.

Since the defendants have demonstrated no compelling reason why the admissions policy of the Medical Center should provide for only the "minimum requirements" of education in the area of abortion, this Court must find that the resolution of June 7th is constitutionally infirm, and enjoin its enforcement.[14]

## THE RESOLUTION OF JUNE 23, 1973

On June 23, 1973, the Board of Regents passed the following resolution:

"If a member of the full time faculty of the Obstetrical/Gynecological Department does abortions outside of the University Hospital, his employment at the University Medical Center will be subject to termination procedures, and is cause for termination."

University of Nebraska Board of Regents Official Minutes [June 23, 1973].

Furthermore, it was resolved at that meeting that all income derived by full-time members of the Ob/Gyn Department from "referred" patients for the performance of abortions should "be placed in a separate account under the direction of the Chancellor of the Medical School." Id. The fund was to "be utilized under the direction of a committee appointed by the Chancellor of the University of Nebraska Medical Center subject to the approval of the Board [of Regents]." *Id.*

In order to weigh the propriety of the Board's prohibition against the performance of abortions outside the University Medical Center, it is necessary to explore in greater detail the pre-existing employment relationship between the University and its full-time faculty.

Unless the University can assure a sufficient number of new admissions to its Medical Center for educational and research purposes, it is obvious that it cannot adequately plan and program its curriculum for the year. It is primarily for this reason that the University seeks to develop and maintain a large number of full-time professional faculty members who are obligated to devote their entire practice to the Medical Center. Consequently, the employment arrangement between the University and its clinical staff personnel is bifurcated. Each clinician has an individual teaching agreement with the University, which provides him with compensation for his teaching duties, and the clinicians, as a group, have negotiated a Medical Service Plan with the University to cover the professional, medical, services which they provide. Each of these separate agreements recognizes the essential role played by the other agreement in the overall relationship between the University and the clinicians. The teaching agreement specifies that the amount of salary earned by the clinician will not be affected by "fees and other income" earned under the Medical Service Plan. [Exhibit 21]. Likewise, the Medical Service Plan provides that "the University of Nebraska Medical Center is an integral part of the University of Nebraska" and that "[i]t must function in a manner consistent with the integrity and responsibilities of the University" which requires that "the full-time faculty and staff members must be dedicated to the primary missions of the Center" which are education, research and patient care. The

---

14. While this Court objects on constitutional grounds, to the Board's resolution of June 7th, it does not seek to intrude unnecessarily upon the state's legitimate interest in maintaining the character of the Medical Center as a *teaching* hospital. Consequently, the Court expressly approves the statement of the Court in Bagley v. Romney, No. C–50–73 [D.Utah, filed Mar. 20, 1973] :

"3. That the University . . . need not accept patients for the performance of abortion operations which are other than in the *normal course* of its mission as a teaching institution and college of the University . . . .." [Emphasis added].

University of Nebraska Medical Service Plan. [March 5, 1971 at page 1.].

In order that the goals of the University can be served without unduly restricting the professional and financial success of the members of the clinical faculty, the University authorities have attempted, through the use of the Medical Service Plan, to assure a large number of new admissions to the University Hospital by requiring a certain portion of its clinical faculty to be "geographic" full time i.e., limiting their medical practice exclusively to the Medical Center—while permitting these faculty members to earn the usual professional fees for their medical services. In this manner the University assures new admissions to its Medical Center by relying upon the medical reputation of its clinical faculty.

Furthermore, by maintaining a geographic full-time faculty and by requiring this faculty to accept only patients which serve the educational and research goals of the College of Medicine, the University is able to control and conform the medical practice of its full-time faculty to the curriculum of the Medical Center.

From the foregoing it is obvious that the pre-existing contract between the University and these plaintiffs [who were geographic full-time instructors on July 14, 1973] prohibited them from practicing medicine outside of the geographic confines of the University Medical Center and "officially affiliated hospitals and clinics" with administrative approval. The validity of that contractual limitation is not challenged in this case. Therefore, the question with respect to the June 23rd resolution is whether the Board of Regents may provide that the performance of abortions outside the Medical Center is cause for instituting termination proceedings and is cause for termination.

It should initially be stated that the prohibition of the resolution of June 23rd is no broader than the pre-existing contractual prohibition.[15] Therefore, a full-time faculty member on the staff of the Ob/Gyn Department may perform an abortion at an "affiliated" hospital or clinic with administrative approval just as he may perform any other medical procedure under similar limitations.

In light of the fact that this Court has held the June 7th resolution constitutionally invalid, it is obvious that a full-time faculty member is free to perform any abortion which serves the educational and research goals of the University either at the Medical Center or at an affiliated hospital with administrative approval. Only abortions which do not serve those goals are prohibited. Since this Court has held that the integrity of the educational and research missions of the Medical Center are a state interest of sufficient importance to permit intrusion into the area of privacy surrounding abortion, and since the resolution of June 23rd serves that compelling interest in a manner no broader than required to preserve the employment and educational policies of the University, the first resolution of June 23rd is valid and enforceable and injunctive relief will be denied.

The second resolution of June 23rd, i.e., creating a separate fund for referred professional fees under the direction of a committee appointed by the Chancellor subject to the approval of the Board of Regents, is, however, in conflict with the provisions of the Medical Service Plan and since it is in such conflict the Constitutional issues suggested by the plaintiffs need not be reached. Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 [Filed March 25, 1974].

The Medical Service Plan, *inter alia* provides for the administration and dis-

15. Counsel for defendants stated at trial that although the contract between the University and its clinical faculty permits the faculty to provide medical services at "officially affiliated hospitals and clinics" with administrative approval [Exhibit 21], while the resolution of June 23, speaks only of the University Medical Center, the June 23rd resolution was clearly intended to impose the same limitation as the contract.

tribution of funds earned for patient treatment by the clinical faculty of the Medical Center. The plan distinguishes between "referred" patients i.e., those who have been referred to a specific clinician at the University for treatment, and "non-referred" patients i.e., those who have merely come to the Medical Center for treatment without being specifically referred to a particular clinician. Under the Plan all fees derived from "non-referred" patients must be billed, collected and distributed through the Professional Fees Office under the direction of a Board of Directors appointed by an Executive Committee of the Clinicians Group. The Board of Directors is empowered to hire a manager and other employees to administer the Professional Fees Office.

Under the Plan fees from "referred" patients "may" be collected through the Professional Fees Office. However, the rules relating to the distribution of "referred" income are not the same as for "non-referred" income. The Plan provides:

"All professional fees derived from patients whose initial referral is to a specific member of the clinical faculty for a specific purpose shall be disbursed to the individual faculty member."

The University of Nebraska Medical Service Plan [March 5, 1971], at page 5.].

Consequently, even though a clinician may choose to have his "referred" fees collected by the Professional Fees Office, his entitlement to those fees is not affected. When the Board of Regents subjects the distribution of these fees to the direction of a committee appointed by the Chancellor subject to the approval of the Board of Regents, the Board not only changes the identity of the persons administering these funds, but also places impediments in the path of the plaintiffs' entitlement to fees which are rightfully theirs and as such violates its contract. The Board may not, contrary to the express terms of its

agreement, intrude upon the plaintiffs' contractual right to "referred" fees. Masten v. Campbell Manufacturing Co., 188 Neb. 646, 198 N.W.2d 326 [1972]. Just as any other party, the government must comply with the terms of its contracts.

## THE RESOLUTIONS OF JULY 14th AND OCTOBER 12th

Finally, the plaintiffs challenge the action of the Board of Regents on July 14th, and October 12th, 1973, denying the plaintiffs' application for a change in employment status from geographic full-time to part-time. As indicated above, a geographic full-time instructor at the Medical Center is contractually prohibited from practicing medicine outside of the geographic confines of the Medical Center except in limited circumstances. A part-time instructor may, however, engage in outside private practice while performing teaching duties at the Center.

After the Board of Regents resolutions of June 7th, and 23rd, 1973, the plaintiffs, on July 14th, in an effort to provide what they regarded as a necessary medical service to their community, submitted an application for change in employment status in order that they might engage in the outside practice of medicine. Their application was approved and recommended to the Board of Regents by the Chancellor of the Medical Center, the Dean of the College of Medicine, and the Chairman of the Ob/Gyn Department. Though the application requested a permanent change in status, the Board approved only a temporary change for a period of ninety [90] days.

At the October 12th meeting of the Board the ninety [90] day period lapsed and the plaintiffs' renewed application for a permanent change was disapproved.

It is the plaintiffs' contention that the Board's action, denying their request for permanent part-time status, denied them the equal protection of the law.

The plaintiffs' applications of July 14th and October 12th can only be regarded as an offer to modify the pre-existing employment agreement between the parties. Such an offer may not be imposed upon one of the parties to an existing agreement, by the unilateral action of the other contracting party. Morgan v. Wheland Co., 66 F.Supp. 439 [E.D.Tenn.1946] It is also clear that these plaintiffs have no independent constitutional right to demand that the Board of Regents waive valuable contractual provisions in their existing agreement.

However, the plaintiffs contend—and have attempted to prove—that the Board's action, denying their application, resulted in a denial of equal protection. They contend that, while they have no right to demand that the Board grant their applications, the Board may not deny the plaintiffs' applications while at the same time granting the applications of other doctors who are similarly situated, and thereby draw an unreasonable and arbitrary distinction between the plaintiffs and their peers. Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 [1957].

In support of its position the plaintiffs cite the Court to the case of Trister v. University of Mississippi, 420 F. 2d 499 [5th Cir. 1969].

In the *Trister* case two law school professors brought suit against the University alleging that a rule adopted by the University which prohibited all members of the law school faculty from accepting part-time employment from the local Legal Services Program of O.E.O. was unconstitutional. It was brought out by the Court that the activities of that organization were highly unpopular in the community and that the plaintiffs had been previously associated with the program in conjunction with their teaching duties at the University.

At the termination of plaintiffs' current employment contract they were offered full-time contracts by the University which precluded their participation in the O.E.O. program, though it is un-

clear whether the plaintiffs could have accepted other outside employment. The plaintiffs requested a part-time contract which permitted them to devote the remainder of their time to the O.E.O. program. This proposal was turned down by the University.

The plaintiffs filed suit alleging that it was constitutionally invalid for

"A state university law school which permits outside and part-time employment [to] adopt a rule that singles out an OEO Legal Services Program as a sole activity in which faculty members may not be employed."

*Id.* at page 502.

The Court of Appeals agreed. Noting that many faculty members engaged in outside legal practice the Court said:

"The University may well decide not to employ any part-time professors, and it may decide to forbid the practice of law to every member of its faculty. What the University as an agency of the state must not do is arbitrarily discriminate against professors in respect to the category of clients they may represent. Such a distinction is an abuse of discretion which denies to plaintiffs the equal protection of the law guaranteed to them by the Fourteenth Amendment."

*Id.* at page 504.

The *Trister* case does not, however, help these plaintiffs. The Court, in that case noted that the University could prohibit all outside employment by its faculty members if it so desired. That is precisely what the University of Nebraska has done in this case with respect to a particular category of instructor.

Long before the present controversy ever arose the Board of Regents and the administration of the Medical Center recognized the benefits to be derived by maintaining a sizeable proportion of the clinical faculty as geographic full-time. This recognition has since been translated into an employment policy. The Board's decision to institute this policy, the Court must assume, was in no way influenced by the abortion issue. Once

it had decided to maintain a large geographic full-time faculty and once it had obtained the plaintiffs' skills under a full-time contract, the Board was under no mandate to sacrifice those advantages upon the application of the plaintiffs.

Only by demonstrating that they have been denied a *benefit* which is customarily given to others similarly situated may the plaintiffs establish their case on this level. However, the mere fact that the University continues to employ and offer employment on a part-time basis in no way affects either the validity of their policy of requiring some instructors to be full-time staff personnel, or the validity of their decision not to modify the plaintiffs' pre-existing contract, in this case.[16]

The plaintiffs have attempted to establish their case by demonstrating that in the three years since the adoption of the Medical Service Plan, five full-time clinical instructors have been permitted to change their employment status to part-time. However, of those five, one was accorded part-time status following his retirement, and another was permitted to assume part-time duties so that she could take on teaching and research responsibilities in another department of the Medical Center.

■ Therefore, there have been only three changes in employment status over the past three years, which are reasonably similar to the change in status suggested by the plaintiffs.[17]

The fact that the University authorities have treated three other applications differently from the treatment they gave the plaintiffs' application is not a sufficient showing to permit this Court to intrude upon the integrity of the employment policy of the University by holding that the University, in this case, has been unreasonable and arbitrary. Stanturf v. Sipes, 335 F.2d 224 [8th Cir. 1964] cert. denied 379 U.S. 977, 85 S.Ct. 676, 13 L.Ed.2d 567 [1967]. Indeed, the evidence in this case strongly suggests that on July 14th and October 12th, 1973, the Board was motivated by facts and circumstances other than the plaintiffs' involvement in the abortion controversy. It has been plaintiffs' contention throughout that the Regents denied their change in employment status to permanent part-time because they wished to disassociate the Medical Center with the abortion controversy, by substantially limiting the number of abortions performed there and the number of abortions performed by physicians associated with the Center. However, it is interesting to note that although the resolutions of June 7th and June 23rd had effectively removed the controversy from the Center, the Board, nevertheless granted the plaintiffs temporary part-time status on July 14th. This had the effect of permitting the plaintiffs—who were associated with the Center—to circumvent the June resolutions. If, at that time, the Regents had been motivated, as the plaintiffs suggest, they could have completely disassociated the University from the controversy by merely denying plaintiffs' request outright. At that time, this would have required that plaintiffs either conform to the University policy, sever relations with the University, or suffer termination proceedings. The fact that temporary part-time status was granted suggests that the Regents are correct when they assert that the denial of

---

16. In the case of Seagram & Sons v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336, rehearing denied, 384 U.S. 967, 86 S.Ct. 1583, 16 L.Ed.2d 679 [1966], the Court held: "A statute is not invalid under the Constitution because it might have gone farther than it did, or because it may not succeed in bringing about the result that it intends to produce . . .. The reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." [Citations omitted.]
384 U.S. at 50–51.

17. At or about the time of the three employment status changes in question, there were 116 full-time clinical faculty members on the staff of the University Medical Center.

plaintiffs' request for a permanent change on July 14th, and October 12th was motivated by their concern that the Ob/Gyn Department was understaffed at that time and they did not want to further aggravate that situation. The only reason for granting temporary part-time status was because of their knowledge that plaintiffs were dissatisfied with the new University policy and were threatening resignation. By granting temporary part-time status, the Board was attempting to give the Chancellor an opportunity to work out these difficulties before the University suffered the loss of plaintiffs' services.

Furthermore, the Court notes that release from a contractual obligation with a government entity while that obligation continues to serve a valid and important governmental policy, is a somewhat unusual situation. It is not at all a common governmental *benefit* as is the case of government hiring or promotion practices. Perry v. Sindermann, 408 U. S. 593, 92 S.Ct. 694, 33 L.Ed.2d 570 [1972]; Watts v. Board of Curators, 495 F.2d 384 [8th Cir. 1974]; Gieringer v. Center School District No. 58, 477 F.2d 1164 [8th Cir. 1973]. Consequently, the plaintiffs were faced with a significant burden in demonstrating that they have been denied equal protection. A burden which this Court does not feel has been carried by a preponderance of the evidence.

The final issues raised by the defendants are whether or not the plaintiffs have violated any of their contractual obligations to the University and whether or not the University is required to renew the contract of the plaintiff, Dr. Dietrich, who is un-tenured.

The defendants seem to be contending that since the plaintiffs' full-time contract prohibited them from practicing medicine outside of the University Medical Center and affiliated hospitals, that the plaintiffs have violated their contract in establishing a private clinic for the treatment of patients in August of 1973. However, in light of the Board's action in granting part-time status to the plaintiffs on July 14th, 1973, and the temporary restraining order issued in this case which preserved the status quo of the parties on November 7th, 1973, this Court cannot find that the plaintiffs are in violation of their contract.

When part-time status was revoked on October 12th, 1973, the plaintiffs were given a reasonable time within which to bring themselves into compliance. The restraining order issued before either plaintiff was advised that a reasonable time had elapsed, and this Court cannot find as a matter of law that less than thirty [30] days under these circumstances exceeded a reasonable time. Ansbacher-Siegle Corp. v. Miller Chemical Co., 137 Neb. 142, 288 N.W. 538 [1939].

On the question of whether the University is required to renew the contract of Dr. Dietrich, the Court will refrain from entering any judgment on that issue on the grounds that the issue is not ripe for adjudication.[18] There is certainly nothing on this record to indicate that Dr. Dietrich would be subject to dismissal for cause, however, the Court is aware that since Dr. Dietrich is untenured it may not be necessary for the Board to find cause. Any reason or no reason at all might permit the Board to fail to renew Dr. Dietrich's contract, subject, of course, to the rule of Perry

---

18. Exhibit 33, a letter from defendants' attorney to Dr. Dietrich, indicated that if plaintiff were found in violation of his employment contract the Board might not continue or extend his contract beyond its term. In light of the fact that no violation was found, a ruling on this issue could merely anticipate some action which the Regents might or might not take in the future. Jurisdiction to issue such an advisory opinion is not granted in 28 U.S.C. § 2201.

v. Sindermann, *supra*, as that rule has been applied by this Circuit. Watts v. Board of Curators, *supra*; Gieringer v. Center School District No. 58, *supra*.

Accordingly, an order will be entered enjoining the Board of Regents from enforcing its resolution of June 7th, 1973, and its resolution of June 23rd, 1973, establishing a separate account for fees earned from "referred" abortion patients.