Robbie Mae **HATHAWAY**, Plaintiff, Appellant,

v.

**WORCESTER CITY HOSPITAL et al.,** Defendants, Appellees.

No. 72–1114.

United States Court of Appeals, First Circuit.

Heard Jan. 3, 1973.

Decided March 22, 1973.

Mel L. Greenberg, Worcester, Mass., with whom Teshoian, Greenberg & Drapos, Worcester, Mass., and Matthew Feinberg, Boston, Mass., were on brief, for appellant.

Bennett S. Gordon, Asst. City Sol., for appellees.

Roger P. Stokey and Goodwin, Procter & Hoar, Boston, Mass., on brief for Planned Parenthood League of Massachusetts, amici curiae.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.

COFFIN, Chief Judge.

Appellant, who has had twelve pregnancies resulting in eight live offspring, and whose life would be jeopardized by future pregnancies, challenges as unconstitutional the policy of the Worcester City Hospital barring the use of its facilities in connection with any consensual sterilization.

The following facts are established by the record. Appellant, married and 36 years old at the time of the complaint, suffers from high blood pressure and an umbilical hernia which, in addition to the sheer number of past pregnancies, render future pregnancies a risk to her life. Her blood pressure and heavy, irregular menstrual flow render birth control bills, intrauterine devices and other generally reliable contraceptive means either dangerous or ineffective. A therapeutic sterilization has therefore been recommended by her physician. The correctness of this advice is not disputed.[1] In addition, a psychological

---

1. Although sterilization of her husband would be an equally effective means of insuring against all future pregnancies, the hospital's ban applies to sterilization of both males and females. Thus even were such a course recommended or considered, the status of this case would not change.

evaluation revealed that "further pregnancies might represent a sufficiently stressful circumstance to result in her psychological deterioration." Finally, she and her husband, who both work, have a combined yearly income of approximately $7500, which is below the federally defined poverty level for a non-farm family of 10. Although they are insured, through her husband's employment, by Blue Cross and Blue Shield, their policy, while covering the expenses of childbirth, does not cover the expenses of the recommended tubal ligation.

The hospital is a municipal hospital established pursuant to state law, Mass. Gen.Laws Ann. ch. 40, § 5(20), ch. 266, Mass.Acts of 1953, and city ordinance, ch. 4, § 1, Revised Ordinances of Worcester (1951 ed.), "for the reception of persons requiring relief during temporary sickness." Being an "acute short term general hospital", it does not provide indefinite or custodial treatment. The hospital recognizes the right of the appellant, as a resident of Worcester, to in-patient admission for any surgical or other procedure, such as childbirth, which it permits and for the performance of which it has the proper facilities. Although the hospital does not recognize a right of the appellant to have any in-patient procedure done free of its ordinary charges, it would admit her regardless of her financial condition for the performance of any permitted in-patient procedure. The hospital does provide free of charge, through its clinics, both pre-natal and post-partem care for Worcester residents who meet the hospital's income standards. The cost of a tubal ligation, whether performed in conjunction with a childbirth (in which case it is less expensive, painful, and disruptive of the patient's life) or separately, is significantly less at the Worcester City Hospital than at nearby private hospitals.

In June, 1970, the Board of Trustees, following receipt of an opinion by the Assistant City Solicitor of Worcester, formally adopted its pre-existing policy barring physicians from utilizing operating room facilities or staff personnel employed in support of those facilities, for the purpose of sterilization. Appellee administrator specifically refused appellant's request that the hospital permit her doctors to perform a tubal ligation at the time of the delivery of her eighth child in April, 1971. Nor was the operation performed after the delivery, despite apparent further requests. In the interim, the instant suit was filed in the district court, pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief and damages. The district court originally dismissed the complaint against the hospital because it was not a body corporate and thus not a proper party; and against the three named doctors, the chief of the surgical division, who is also president of the Board of Trustees, the chief of obstetrics and the administrator, for failure to state a claim. Uncertain of the state law and finding the record inadequate, we remanded the case for further findings and certification to the Massachusetts Supreme Judicial Court. After several evidentiary hearings, the district court again dismissed the complaint, this time solely on the ground "that plaintiff's substantive federal claim under 42 U.S. C. § 1983 is without merit", after concluding that the state law could not reasonably be construed to require the hospital to perform this type of operation. Hathaway v. Worcester City Hospital, 341 F.Supp. 1385, 1387 (D.Mass.1972). After a further remand to determine other facts, this appeal is now ripe for adjudication.

The Assistant Solicitor's opinion, on which the hospital's policy is based, was that the legality of sterilization operations was "highly doubtful", in the light of Massachusetts statutes concerning birth control assistance, Mass.Gen.Laws Ann. ch. 272, §§ 19, 20, 21A, and in any event, at least non-therapeutic sterilizations were beyond the hospital's charter authority. Whatever merit his conclusion as to the illegality of such operations may have had at the time, subse-

quent authority makes it clear that the Commonwealth no longer has, or could have, such an all-encompassing anti-birth control policy as he took the cited statutes to describe. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

■ As to the issue of authority, we conclude that the hospital is neither required nor forbidden to perform such operations. Section 2 of chapter 266 of the Mass.Acts of 1953, which re-enacted and modified the provisions of the earlier law establishing the Worcester City Hospital, ch. 339, Mass.Acts of 1871, states:

"The Worcester City Hospital is established for the reception of persons requiring relief during temporary sickness, including paying patients, and of such persons settled in the City of Worcester who by misfortune or poverty may require such relief."

Section 4 merely provides that the Board of Trustees has the power to make rules and regulations as are deemed expedient and not inconsistent with law. The city ordinance similarly states the hospital's purpose and the power of the Trustees to make rules and regulations. §§ 1, 5, ch. 4, Revised Ordinances of Worcester. The general statute concerning city hospitals, ch. 40 § 5(20), and the specific authorizing statutes for other city hospitals use the identical language in stating the purpose of their establishment.

Neither we nor the parties have found any state interpretation of the key words "relief during temporary sickness" or of the nature of a city hospital's obligations to perform procedures arguably or indisputably covered by that phrase. By stipulation, however, it appears that at the appellee hospital, "[t]he range of surgical problems and services includes, but may not be limited to" appendectomies, varicose veins, pilonidial cystectomies, hemorrhoidec-

tomies, circumcisions, "and other less complicated prophylactic sur al procedures, such as removal of stones". In addition, "the Board of tees has permitted surgeons who spe in the field of plastic or cosmeti ery to perform certain types of procedures, including but not limited to rhinoplasty, [known colloquially as plastic nose surgery] [and] skin graphs [sic]." The Assistant Solicitor concedes that many of these procedures do not fall within the narrow reading of "temporary sickness" which he would apply to sterilizations. We also know through evidence that tubal ligations are regularly performed at both Boston and Cambridge City Hospitals, in the former "almost on demand", both hospitals being subject to the same general authorizing statute.

The differing hospital practices suggest to us the most obvious and reasonable interpretation of the authorizing statutes and ordinance: that the range of services to be provided by the hospital is to be determined by the hospital's board of trustees, limited only by inconsistent provisions of law and the hospital's broad general mandate. Thus, for example, we think it clear that the hospital could not, until recent times, have liberally permitted abortions or prescribed contraceptives. Similarly, it could not restrict itself to the indefinite care of mentally retarded children or bar poor residents of Worcester. Yet, within that broad area, the board may set policies commensurate with its budget, facilities, the ability of its staff, its role as an educational hospital for young interns and residents, the needs of the community, and other similar relevant factors.

Probably the most significant factor dictating such an open-ended definition is the anticipation of change in medical science. Freezing the hospital's services at those common in 1871, as the Assistant Solicitor suggested, or even those common in 1953 would dictate obsolescence. Moreover, whatever the definition of "sickness" may have been in ear-

lier epochs, it now encompasses "[a] condition or an episode marked by pronounced deviation from the normal healthy state", Borland's Illustrated Medical Dictionary, 24th ed., or "a disordered, weakened, or unsound condition", Webster's New International Dictionary, 3d ed. Removal of tonsils or an appendix highly susceptible to infection or, as the stipulation describing the appellee's services notes, "excisions of benign tumors which could cause subsequent neurological problems", would seem not only required by sound medical practice but consistent with a more expansive reading of "sickness". The same could be said of termination of appellant's capacity for childbearing. On the other hand, *requiring* the performance of every new available procedure which could help remedy anything encompassed by a modern delineation of "sickness", would impose vast budgetary, administrative and physical re-ordering without regard to community or hospital needs.

We thus do not believe that, in the absence of constitutional considerations, the Massachusetts Supreme Judicial Court would require a city hospital to perform a specific surgical procedure if its general operations were sufficiently broad-based to satisfy the statutory purpose or that it would bar any specific operation absent a clear statutory prohibition, not present here. Although we realize that the state statute might fairly have been interpreted differently by the Massachusetts court, we now believe it imperative not to further delay decision of this controversy which vitally affects the appellant's very life, Zwickler v. Koota, 389 U.S. 241, 252, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Harman v. Forssenius, 380 U.S. 528, 537, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Baggett v.

Bullitt, 377 U.S. 360, 379, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). We therefore decline to exercise our discretionary power to abstain or certify the question. *Baggett,* 377 U.S. at 375, 84 S.Ct. 1316.

Appellee's principal present argument is that even if it is not in any way impermissible to perform this procedure, the Trustees are free to decide what they will and will not do. Even under the "rational relationship" test applied in Eisenstadt v. Baird, *supra,* 405 U.S. at 447, 92 S.Ct. 1029, we might have had difficulty in upholding the policy of a complete ban on sterilizations. For here the evidence shows that tubal ligations involve no greater risk than appendectomies, which the hospital regularly performs, and by inference, than the other listed procedures of like complexity which are also performed. In addition, elective surgery, of unspecified risk, is permitted, though not in any sense therapeutic. No special facilities, equipment or staff are required for a ligation.

■ But it seems clear, after *Roe* and *Doe,* that a fundamental interest is involved, requiring a compelling rationale to justify permitting some hospital surgical procedures and banning another involving no greater risk or demand on staff and facilities.[2] While *Roe* and *Doe* dealt with a woman's decision whether or not to terminate a particular pregnancy, a decision to terminate the possibility of any future pregnancy would seem to embrace all of the factors deemed important by the Court in *Roe* in finding a fundamental interest, 410 U.S. at 155, 93 S.Ct. 705, but in magnified form, particularly so in this case given the demonstrated danger to appellant's life and the eight existing children.

2. Although in a strict sense, *Roe* and *Doe* could be said only to establish that the sterilization decision may not be made subject to criminal sanctions, fundamental interests are not protected only against affirmative state impositions. Rather, as the many voting, *see, e. g.,* Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.

2d 675 (1965), Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), and welfare cases, *see, e. g.,* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), indicate, any infringement of a fundamental interest, including a simple denial of a benefit must be carefully scrutinized.

The state interests, recognized by *Roe* as legitimate, are far less compelling in this context. Whatever interest the state might assert in preserving the possibility of future fetuses cannot rival its interest in preserving an actual fetus, which was found sufficiently compelling to outweigh the woman's interest only at the point of viability. The state maintains of course a significant interest in protecting the health and life of the mother who, as here, cares for others whom the state might otherwise be compelled to provide for. Yet whatever health regulations might be appropriate to vindicate that interest, and on the present record we need not decide the issue,[3] it is clear under *Roe* and *Doe* that a complete ban on a surgical procedure relating to the fundamental interest in the pregnancy decision is far too broad when other comparable surgical procedures are performed.

■ *Doe* is particularly apposite in this regard. The Court there struck down the Georgia requirements of advance approval of an abortion by a hospital committee of three staff members and the additional concurrence of two doctors other than the patient's attending physician, primarily on the ground that "We are not cited to any other surgical procedure made subject to committee approval" and "no other voluntary medical or surgical procedure for which

Georgia requires confirmation by two other physicians has been cited to us." 410 U.S. at 199, 93 S.Ct. at 751.[4] Here we are cited to no other surgical procedure which is prohibited outright and are told that other procedures of equal risk are performed and that non-therapeutic procedures are also permitted. *Doe* therefore requires that we hold the hospital's unique ban on sterilization operations violative of the Equal Protection Clause of the Fourteenth Amendment.[5]

■ In so holding, we are not mandating the city or state to maintain this hospital, or to retain its present size, staff or facilities. The hospital is not required to perform all kinds of non-therapeutic or even all therapeutic surgical procedures. We are merely saying, consistent with the Supreme Court's reasoning in *Shapiro* with regard to welfare payments, that once the state has undertaken to provide general short-term hospital care, as here, it may not constitutionally draw the line at medically indistinguishable surgical procedures that impinge on fundamental rights. *See* Klein v. Nassau County Medical Center, 347 F.Supp. 496 (E.D.N.Y. 1972), appeals pending, 410 U.S. 922, 93 S.Ct. 1361, 35 L.Ed. 584 (1973) (New York's refusal of Medicaid assistance for performance of other than "medically indicated" abortions denies equal pro-

---

3. We note that one medical witness testified that a ligation at the time of childbirth would not be considered as "any hazard to the patient". Moreover, the comparability of risk between an independent ligation and an appendectomy suggest that the restrictions on the former should be no greater than those imposed on the latter. Finally, health regulations would have to account for cases such as the appellant's in which the operation's value in preserving life and health might be said to outweigh the health dangers involved in the operation itself.

4. In the course of discussing the committee requirement, the Court mentioned that the hospital there was in any case protected by a statutory provision leaving it free not to admit a patient for an abortion.

The Court, however, promptly noted that this provision was "obviously" designed to provide protection to "the denominational hospital". *Id.*, 410 U.S. at 198, 93 S.Ct. 739. The Court's use of this provision as partial explanation of the invalidity of the committee requirement cannot, of course, be taken as approving a similar ban in a state or state-supported hospital, like the appellee, which is subject to the First and Fourteenth Amendments of the Constitution.

5. Although we frame our holding in equal protection terms, we note that *Roe* and *Doe* establish that the same compelling interest analysis applies when fundamental rights are adjudicated in due process terms.

tection to indigent pregnant women seeking abortions for other reasons).[6]

■ Accordingly, we reverse and remand for entry of an order declaring the Worcester City Hospital's policy against the use of its facilities in conjunction with sterilization operations unconstitutional and enjoining the individual appellees from enforcing the policy in the future.[7] Since we are uncertain whether the appellant will press her claim for damages, and since there is no record relating to damages, we intimate presently no views in that regard.

Reversed and remanded for further proceedings consistent with this opinion.

6. Since we believe that *Roe* and *Doe* require that we strike down the hospital policy, we have no occasion to consider the constitutional significance of the fact that this policy's primary impact is upon the indigent, that the ban is consonant with the views of a certain religious group, or that the general state authorizing statute, as applied in the various municipal hospitals of the Commonwealth, discriminates on the basis of the geographic residence of its citizenry.

7. In its motion to dismiss and here on appeal the hospital claimed that it was not liable because it was not a "person" within the meaning of § 1983, citing Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Since it is clear from the record that the hospital is a department of the city of Worcester, it is not subject to damages. Henschel v. Worcester Police Dept., 445 F.2d 624 (1st Cir. 1971). The circuits are split, however, on whether *Monroe* also means that municipalities are immune from equitable relief. *Compare, e. g.,* Harkless v. Sweer v Independent School District, 427 F.2d 31 (5th Cir. 1970) with Deane Hill Country Club, Inc. v. City of Knoxville, 379 F.2d 321 (6th Cir. 1967). We need not decide this complex issue here since a declaration and injunction against the relevant supervising hospital officials will fully satisfy appellant's claim.