534 P.2d 285

Jane ROE, for herself and as a class for all those similarly situated, Appellant,

v.

ARIZONA BOARD OF REGENTS, a body corporate, and Bruce E. Babbitt, Attorney General of the State of Arizona, Appellees.

No. 2 CA–CIV 1834.

Court of Appeals of Arizona, Division 2.

April 21, 1975.

Rehearing Denied May 20, 1975.

Review Granted June 24, 1975.

**478**

Pollock & Fisher, by Elaine S. Pollock and Barbara E. Fisher, Tucson, Arizona Public Law Advocates, by Barbara E. Fisher, Tucson, for appellant.

Bruce E. Babbitt, Atty. Gen., by John S. O'Dowd, Asst. Atty. Gen., Tucson, for appellees.

## OPINION

HOWARD, Chief Judge.

Appellant filed this class action in superior court alleging that the State of Arizona unconstitutionally denied her right to have an abortion. She later filed a motion for partial summary judgment declaring A.R.S. § 15–730 unconstitutional and a motion that the action be maintained as a class action. Appellees also filed a motion for summary judgment. This appeal followed the trial court's granting of appellees' motion for summary judgment.

The facts are undisputed. At the time the complaint was filed on June 21, 1974, appellant was a nineteen-year-old unmarried female. She was eligible for medical assistance from Pima County and for several months had been under the care of Dr. Harlan Giles, Professor of Obstetrics and Gynecology at the University of Arizona Medical Center. On June 19, 1974, appellant was sixteen to seventeen weeks pregnant, and she and her physician determined it would be in her best interest to have an abortion. Although the University of Arizona Medical Center had been performing abortions since the decision of the United States Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147 (1973), her doctor informed her that he had been advised on or about May 17, 1974, that because of Arizona law and the Board of Regents' policy, the University Hospital would not permit use of its facilities for performing an abortion unless it was necessary to save the life of the mother.

Abortions were being performed within the guidelines set forth by Roe v. Wade, supra, until May 16, 1974, when the Arizona State Legislature passed A.R.S. § 15–730 as a rider to a bill authorizing the Board of Regents to issue revenue bonds in order to remodel the football stadium at the University of Arizona. This statute provides:

"No abortions shall be performed at any facility under the jurisdiction of the board of regents unless such abortion is necessary to save the life of the woman having the abortion."

The enactment of the statute was followed by the Board of Regents passing a resolution conforming to this statute.

The Board of Regents in addition to the aforementioned statute relies on A.R.S. § 36–2151 to justify its actions. This statute, passed in 1973, states:

"No hospital is required to admit any patient for the purpose of performing an abortion. A physician, or any other person who is a member of or associated

with the staff of a hospital, or any employee of a hospital, doctor, clinic, or other medical or surgical facility in which an abortion has been authorized, who shall state in writing an objection to such abortion on moral or religious grounds shall not be required to participate in the medical or surgical procedures which will result in the abortion."

When the instant case was filed appellant requested a temporary restraining order, which was granted, restraining appellees from prohibiting her abortion at the University Hospital.[1] Since the filing of this lawsuit an abortion was performed at the University Hospital upon appellant.

In granting appellees' motion for summary judgment the trial court ruled that while appellant may have a right to obtain an abortion she is not entitled to have one provided by the State as a matter of right at the University Hospital. It further ruled that A.R.S. § 15–730 does not regulate appellant's constitutional rights but rather the operation of a state-owned and state-operated facility and that it is not invalid on its face; that appellant had not established that the statute infringed upon her rights under Roe v. Wade supra; that there was no showing that it was an appropriate case for a class action; and that even if appellant were to prevail her attorneys' fees would not be recoverable from appellees.

Appellant presents the following questions for review:

"1. Did the trial court err in upholding the constitutionality of A.R.S. § 15–730 in light of the Supreme Court's decision in Roe v. Wade and Doe v. Bolton and cases interpreting those decisions?

2. Is A.R.S. § 36–2151 unconstitutional and overbroad in that it permits a state owned and operated hospital to refuse to admit any patient for the performance of an abortion?

3. Did the Defendants violate Title 42 U.S.C. § 1983 by depriving Plaintiff of her constitutional rights under color of State law?

4. Did the trail [sic] court err in denying Plaintiff the right to represent the class of persons similarly situated?

5. Did the trial court err in denying attorneys fees to Plaintiff when Plaintiff has been forced to litigate to exercise her fundamental constitutional rights?"

## CONSTITUTIONALITY OF THE STATUTES

The language of Roe v. Wade, supra, and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), makes it clear that an abortion decision and its implementation is a fundamental right of personal liberty embraced within the due process clause of the Fourteenth Amendment and is thereby protected from undue infringement by the State. Absent compelling circumstances of state interest, regulation of abortion is unconstitutional. Roe v. Wade, supra, 410 U.S. at 155, 93 S.Ct. 705.

The point of "compelling interest" was set out in a tripartite test by the Supreme Court in Roe v. Wade:

"(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the

---

1. This order was entered by the Hon. Richard N. Roylston.

mother." 410 U.S. at 164–65, 93 S.Ct. at 708.

▪ Where the State fails to take cognizance of the separate trimesters of pregnancy in its regulation of abortion procedures, the regulation is overbroad and invalid. Doe v. Bolton, supra; Roe v. Wade, supra; Nyberg v. City of Virginia, 495 F.2d 1342 (8th Cir. 1974), cert. denied 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136.

▪ The trial court's rationale in upholding A.R.S. § 15–730 on the basis that there is no requirement that the State provide appellant with an abortion was advanced and rejected by the Court in Nyberg v. City of Virginia, supra:

"Appellant frames the issue to be whether the state has an affirmative duty under *Roe* and *Doe* to provide abortion facilities. This record does not present a situation where the hospital would be required to establish new or different facilities and staff in order to perform the operations. For reasons set out below, we find that the district court in this case was correct in ordering the Virginia Municipal Hospital to make its existing facilities available for the performing of abortions." 495 F.2d at 1345.

As in the *Nyberg* case, the record here shows that the University of Arizona Hospital had been performing abortions and that it was not necessary to create new facilities or staff in order to perform them. We agree with the *Nyberg* court's reasons for holding that the Virginia Municipal Hospital had to make its existing facilities available for performing abortions. It adopted the rationale of Hathaway v. Worcester City Hospital, 475 F.2d 701 (1st Cir. 1973):

"But it seems clear, after *Roe* and *Doe*, that a fundamental interest is involved, requiring a compelling rationale to justify permitting some hospital surgical procedures and banning another involving no greater risk or demand on staff and facilities. * * * [I]t is clear under *Roe* and *Doe* that a complete ban on a surgical procedure relating to the fundamental interest in the pregnancy decision is far too broad when other comparable surgical procedures are performed. * * * [O]nce the state has undertaken to provide general short-term hospital care, as here, it may not constitutionally draw the line at medically indistinguishable surgical procedures that impinge on fundamental rights." 475 F. 2d at 705–706.

As to the constitutionality of the statute in question we approve the following quotation from *Nyberg*:

"It would be a nonsequitur to say that the abortion decision and its effectuation is an election to be made by the physician and his patient without interference by the state and then allow the state, through its public hospitals, to effectively bar the physician from using state facilities to perform the operation." 495 F.2d at 1346.

▪ In accord with the *Nyberg* case is Doe v. Hale Hospital, 500 F.2d 144 (1st Cir. 1974) cert. denied, 420 U.S. 907, 95 S. Ct. 825, 42 L.Ed.2d 837 (1975), which held that a public medical facility may not forbid elective abortions so long as it offers medically indistinguishable procedures, without violating the fundamental right associated with the decision to terminate pregnancy. See also, Friendship Medical Center Ltd. v. Chicago Board of Health, 505 F.2d 1141 (7th Cir. 1974) and Orr v. Koefoot, 377 F.Supp. 673 (D.Neb.1974). As for A.R.S. § 36–2151, in view of the foregoing discussion, the first sentence thereof ("No hospital is required to admit any patient for the purpose of performing an abortion.") is overbroad and unconstitutional when applied to public hospitals.

## VIOLATION OF TITLE
42 U.S.C. § 1983

42 U.S.C. § 1983 provides as follows:

"Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other per-

son within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (Emphasis added)

New Times, Inc. v. Arizona Board of Regents, 110 Ariz. 367, 519 P.2d 169 (1974), held that a state court has jurisdiction to entertain a claim for damages under this federal statute.

██ However, neither equitable relief nor damages can be awarded under Title 42 U.S.C. § 1983 against the Board of Regents, a state agency, since it is not a "person" within the meaning of said statute. City of Kenosha v. Bruno 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Whitner v. Davis, 410 F.2d 24 (9th Cir. 1969); Adamian v. University of Nevada, 359 F. Supp. 825 (D.Nev.1973); Webb v. Lake Mills Community School District, 344 F. Supp. 791 (N.D.Iowa 1972). Appellant has asked us for leave to amend to add the individual members of the Board of Regents as defendants. This is a matter which should be addressed to the trial court.

We express no opinion as to the ultimate liability under § 1983 for damages of the Attorney General or of the individual members of the Board of Regents who were merely following the statutory mandate. We note only that § 1983 is not a panacea for all wrongs.

## CLASS ACTION

██ The courts have uniformly granted class status in actions challenging restrictive abortion laws and policies of public hospitals. Doe v. Bolton, supra; Doe v. Hale Hospital, supra. Appellant's pregnant state when she commenced this action gave her standing to maintain it and this status continued even though appellant had obtained an abortion at the time of the hearing on the motion for summary judg-

ment. Doe v. Poelker, 497 F.2d 1063 (8th Cir. 1974).

## ATTORNEY'S FEES

██ The general rule in this State is that attorney's fees are not recoverable in the absence of a contract or statute authorizing them. There are exceptions to the general rule [2] which allow the court, in order to do equity, to assess attorney's fees against the defendant. One such exception is the "common fund" theory adopted in Steinfeld v. Zeckendorf, 15 Ariz. 335, 138 P. 1044 (1914), aff'd 239 U.S. 26, 36 S.Ct. 14, 60 L.Ed. 125 (1915), where a stockholder's suit for the benefit of the corporation resulted in the recovery of monies by the corporation. The court stated:

"This action was prosecuted by appellee as a stockholder therein for the benefit of the Silver Bell Company, and, as a result thereof, the company has been enriched to the amount recovered. . . . Right and justice require that the company protect the appellee against any costs that he may have incurred in the employment of attorneys or otherwise, . . ." 15 Ariz. at 342, 138 P. at 1047.

In the instant case, the "common fund" theory is inapplicable.

Some courts recognize another exception and have concluded that the interests of justice require fee-shifting in cases where the plaintiff is acting as a "private attorney general", vindicating an important public policy. Wilderness Society v. Morton, 161 U.S.App.D.C. 446, 495 F.2d 1026 (1974) cert. granted 419 U.S. 823, 95 S.Ct. 39, 42 L.Ed.2d 47. This theory has been applied by the federal courts in § 1983 actions. Hoitt v. Vitek, 495 F.2d 219 (1st Cir. 1974). As noted by the Supreme Court in Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) the federal courts, in the exercise of their equitable jurisdiction, have been more liberal than the state courts in awarding attorney's fees

---

2. See United States Fidelity & Guaranty Co. v. Frohmiller, 71 Ariz. 377, 227 P.2d 1007 (1951). Attorney's fees are recoverable for wrongful injunctions.

to the successful party. The argument advanced by the courts in favor of the "private attorney general" theory is exemplified by Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972):

> "The violation of an important public policy may involve little by way of actual damages, so far as a single individual is concerned, or little in comparison with the cost of vindication . . . .. If a defendant may feel that the cost of litigation, and, particularly, that the financial circumstances of an injured party may mean that the chances of suit being brought, or continued in the face of opposition, will be small, there will be little brake upon deliberate wrongdoing. In such instances public policy may suggest an award of costs that will remove the burden from the shoulders of the plaintiff seeking to vindicate the public right." 453 F.2d at 853.

Assuming, but not deciding, the applicability of the "private attorney general" doctrine, the question remains whether such argument is meritorious under the facts of the instant case. When a defendant is obeying a duly enacted state law should attorney's fees be assessed against that defendant when the statute is subsequently determined to be unconstitutional? Since the doctrine of the "private attorney general" is equitable in origin we believe, and so hold, that it would not promote the ends of justice under such circumstances to allow attorney's fees.

This case is reversed and remanded for further proceedings consistent with this opinion.

KRUCKER, J., concurring.

HATHAWAY, Judge (dissenting).

Although abortions during the first trimester of pregnancy are encompassed within the activities included within the constitutionally protected right of privacy, Roe and Doe, I respectfully submit that my brethren of the majority and the cases upon which they rely have misread Doe v. Bolton, wherein the high court approved of a section in the Georgia statute affording broader protection than appellees were given in the case at bench. Although the court invalidated the portion of the Georgia statute providing for committee approval of abortions, with guidelines, the court noted that the Grady Memorial Hospital, apparently a non-denominational hospital for indigents, was afforded protection in the statute in that the hospital did not have to accept patients for abortions, stating:

> ". . . Viewing the Georgia statute as a whole, we see no constitutionally justifiable pertinence in the structure for the advance approval by the abortion committee. . . . The woman's right to receive medical care in accordance with her licensed physician's best judgment and the physician's right to administer it are substantially limited by this statutorily imposed overview. And the hospital itself is otherwise fully protected. Under § 26-1202(e) the hospital is free not to admit a patient for an abortion. It is even free not to have an abortion committee. Further, a physician or any other employee has the right to refrain, for moral or religious reasons, from participating in the abortion procedure. These provisions obviously are in the statute in order to afford appropriate protection to the individual and to the denominational hospital. Section 26-1202(e) affords adequate protection to the hospital and little more is provided by the committee prescribed by § 26-1202(b)(5)." 410 U. S. at 197, 93 S.Ct. at 750, 35 L.Ed.2d at 215-6.

In Nyberg v. City of Virginia, supra, heavily relied upon by the majority, it was recognized that the high court held in Roe and Doe that an applicant was not entitled to an abortion upon demand, as specifically pointed out in Chief Justice Burger's specially concurring opinion, and also that the high court in Doe upheld the Georgia statutory protections afforded the hospital, i. e., the right not to accept a patient for abortion. The court falls into error by reading that provision as being available

*only* for denominational hospitals, overlooking the high court's endorsement of the provision as affording protection to Grady Memorial Hospital, an apparently non-denominational hospital. In any event, the availability of the statutory protection of the right to decline admission of a patient for purposes of abortion was not made to appear to rest upon the denominational status of the hospital or the lack thereof.

Multitudinous activities are included within the protective mantle of the precious right to be left alone and governmental interference with those activities is proscribed as an invasion of the individuals' right to privacy. Translation of that protection into the imposition of an affirmative duty upon every hospital capable of performing an abortion, or any other medical service, the obligation to do so, is unjustified.

A look at other fundamental rights points up the problems accompanying such a broad holding. The right to travel has been held to be a fundamental right, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Vast and constant transportational activity takes place in all levels of government. Should courts require that available transportation within these governmental functions be open to travelers, or should the judiciary mandate establishment of a transportation system for purposes of carrying out the fundamental right of travel? The right to procreation has been held a fundamental right in Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). This would not seem, however, to require the establishment of clinics to further the right.

Courts are ill-equipped to assess and determine the capabilities of a hospital to furnish particular of the multitudinous services which may arise in the physician-patient relationship and adjudislate[1] which

of those services the facility is duty-bound to furnish. The Legislature, the Board of Regents and the administration of the University and the hospital are in a position to determine the nature and extent of services that should be made available at the University Hospital and to provide for the payment of such services. Many considerations obviously arise in reaching such decision, not the least of which include the teaching orientation of the hospital, the burden which may be imposed by undertaking a particular activity, the risk of liability and the provision of adequate malpractice insurance coverage.

By no means should courts through insensitive judicial mandate require that all hospitals perform all possible services, simply because they may be capable of doing so. Specialization and limitation of services may frequently be necessary. Establishment of priorities in the public health sector falls beyond the judicial perogative. The fine-tuning required to make available the best over-all medical services must remain within the deft touch of the medical community.

I would affirm.

---

1. Adjudislate, to judicially legislate. A practice beyond the legal jurisdiction of the judiciary, but not beyond its power. The only available means for dealing with adjudislation is through review in the higher echelons of the appellate judiciary. Effectiveness of such review is in proportion to the degree of judicial restraint which the highest appellate court imposes.