549 P.2d 150

**Jane ROE, for herself and as a class for all those similarly situated, Appellant,**

v.

**ARIZONA BOARD OF REGENTS, a body corporate, and Bruce E. Babbitt, Attorney General of the State of Arizona, Appellees.**

**No. 12143–PR.**

Supreme Court of Arizona,
In Banc.

May 11, 1976.

Rehearing Denied June 9, 1976.

Pollock & Fisher by Elaine S. Pollock and Barbara E. Fisher, Tucson, Arizona Public Law Advocates by Barbara E. Fisher, Tucson, for appellant.

Bruce E. Babbitt, Atty. Gen., by John S. O'Dowd, Asst. Atty. Gen., Tucson, for appellees.

HOLOHAN, Justice.

Jane Roe, a nineteen-year-old unmarried female, filed an action against the Arizona Board of Regents and the Attorney General seeking a declaratory judgment that an Arizona statute prohibiting certain types of abortions at the University Hospital was unconstitutional. Summary judgment was granted in favor of the defendants. On appeal, Division Two of the Court of Appeals reversed the decision of the superior court, and we granted review. The opinion of the Court of Appeals, Division Two, 23 Ariz.App. 477, 534 P.2d 285 (1975) is vacated.

The sole issue [1] in the case is the constitutionality of A.R.S. § 15–730 which provides:

"No abortion shall be performed at any facility under the jurisdiction of the board of regents unless such abortion is necessary to save the life of the woman having the abortion."

Miss Roe's situation is best described by reference to her affidavit in support of

---

[1]. Pursuant to A.R.S. § 36–2151 a hospital is not required to admit a patient for the purpose of performing an abortion. This section has no relevancy to this case because A.R.S. § 15–730 applies to facilities under the jurisdiction of the Board of Regents, and it does not allow the discretion provided in A.R.S. § 36–2151. It must also be noted that A.R.S. § 36–2151 is substantially the same as that portion of the Georgia statute (26–1202(e)) which was not declared unconstitutional in *Doe v. Bolton, supra.*

her motion for a temporary restraining order:

" . . .

"2. I am nineteen years old and I am unmarried. I am a County patient, eligible for medical assistance from Pima County. I am presently pregnant and wish to have an abortion. I have been pregnant twice before; once in 1971, when the fetus died in utero in the third trimester and was delivered by Ceserean [sic] Hysterotomy, and again in 1972, when a full term child was delivered on February 28, 1973, by Ceserean [sic] Section. After the birth of my child I had an I.U.D. inserted to prevent pregnancy.

"3. I am a patient of Dr. Harlan Giles. On March 21, 1974, I received a medical examination at the University Hospital and it was determined that I was six to seven weeks pregnant in spite of the use of the I.U.D. On April 1, 1974, a suction D & C was performed on me to terminate the pregnancy and remove the I.U.D. Dr. Giles was the attending physician. I subsequently began taking birth control pills.

"4. On or about the 19th day of June, 1974, I went to University Hospital and was again examined by Dr. Giles, who determined I was still pregnant and in the sixteenth to seventeenth week of pregnancy. On that date I advised Dr. Giles that I wished to terminate my pregnancy. After consultation, Dr. Giles and I agreed that I should have an abortion immediately. Dr. Giles advised me I would have to have a saline abortion and that it should be performed as soon as possible. Dr. Giles advised me, however, that because of the Arizona law and the Regents' policy, the University Hospital refuses to permit abortions to be performed in the Hospital, and refuses to permit him to perform abortions on his patients.

"5. I do not have funds to arrange an abortion at any private hospital. Dr. Giles had advised me that I should have

the abortion as soon as possible because the longer I wait the more risky the procedure will become. I wish Dr. Giles to perform the abortion because he is my physician and I have confidence and trust in him. I wish to have the abortion performed at University Hospital because Dr. Giles had advised me that in his judgment it is the Hospital of preference under the circumstances.

"6. I already have one child to care for. I have not married. I do not have the physical strength nor the funds to support another baby. I want to have an abortion as soon as possible. . . ."

Over the objections of the defendants, the superior court granted a temporary restraining order preventing the enforcement of the statutory prohibition against nontherapeutic abortions at the University Hospital. Before the hearing on the motion for preliminary injunction, an abortion was performed on Miss Roe.

■ By reason of the decisions of the United States Supreme Court in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed. 2d 147 (1973) and in *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) the termination of Miss Roe's pregnancy after the filing of her action does not moot the case.

■ Essentially, it is the position of the plaintiff that the statute forbidding nontherapeutic abortions in the University Hospital interferes with her decision, which is constitutionally protected, to terminate a pregnancy. She contends that the state government may not interfere with that decision. In support of her position the following cases have been called to our attention: *Doe v. Poelker*, 515 F.2d 541 (CA8, 1975); *Doe v. Hale Hospital*, 500 F.2d 144 (CA1, 1974); *Word v. Poelker*, 495 F.2d 1349 (CA8, 1974); *Nyberg v. City of Virginia*, 495 F.2d 1342 (CA8, 1974); *Hathaway v. Worcester City Hospital*, 475 F.2d 701 (CA1, 1973).

The decision in the *Nyberg* case typifies the rationale in the above cases.

"It would be a nonsequitur to say that the abortion decision and its effectuation is an election to be made by the physician and his patient without interference by the state and then allow the state, through its public hospitals, to effectively bar the physician from using state facilities to perform the operation." 495 F.2d at 1346.

*Nyberg* and the above cases are distinguishable from the present case in that the cited cases involved facilities used for treatment of indigents without adequate alternate facilities being available. Such is not the situation in the present case.

"[A] pregnant woman does not have an absolute constitutional right to an abortion on her demand." *Doe v. Bolton*, 410 U.S. 179, 189, 93 S.Ct. 739, 746, 35 L.Ed.2d 201, 211. The individual choice is the right protected, and the state may not significantly interfere with that decision in the so-called "first trimester." *Nyberg* and similar cases found that by barring abortions from public hospitals there was state action which negated the right of individual choice. The present case presents the situation in which only one public facility is closed to the plaintiff—the University Hospital. We are unaware of any constitutional right which requires that anyone be treated at the University Hospital. The fact that the state restricts the use of such hospital does not significantly interfere with the right of choice to have an abortion.

Plaintiff has not alleged that the only facility reasonably available to carry out her choice is the University Hospital.[2] The affidavits in the file by the physician do not make such a claim. The whole matter is in reality a matter of prefer- ence. Even as plaintiff does not have an absolute right to an abortion on demand, she also does not have a right to select any public facility she chooses for an abortion. If there are alternate adequate public facilities available to her, her right of choice has been protected, and she cannot complain that she would rather have a different facility.

The University Hospital is a teaching hospital. The sole and exclusive responsibility for the hospitalization and medical care of the indigent rests with the county. A.R.S. § 11–291. Pima County, where plaintiff resides, has established a county hospital. There is no suggestion that this facility would not have been available to the plaintiff for the abortion procedure. Under such circumstances there was an alternate public facility available to plaintiff and others in similar condition.

From our review we find that the rights of plaintiff have not been denied; that her freedom of choice is protected by having public facilities available to carry out her choice; that A.R.S. § 15–730 is constitutional.

Affirmed.

HAYS, J., concurs.

CAMERON, Chief Justice (concurring): I concur in the result.

GORDON, Justice (dissenting):

Neither the repeated sexual misconduct of the plaintiff[1] in this case nor my personal feelings as to the morality of the abortion operation can persuade me to concur in the novel reasoning employed by the majority in their dogged determination to uphold the constitutionality of A.R.S. § 15–730.[2] In *Roe v. Wade*, 410 U.S. 113,

---

2. There is a statement in plaintiff's memorandum in support of class action and partial summary judgment which claims that no public hospitals in Tucson perform abortions. Such a statement is not evidence, and it certainly did not meet the requirements of Rule 56(e) Rules of Civil Procedure, 16 A.R.S. There is no evidence in the record that plaintiff was unable to obtain an abortion in the Pima County General Hospital.

1. Jane Roe is a pseudonym.

2. As the Court of Appeals noted, the Arizona State Legislature passed this statute as a rider to a bill authorizing the Board of Regents to issue revenue bonds in order to remodel the football stadium at the University of Arizona.

93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court stated:

"[T]he right of privacy, however based, is broad enough to cover the abortion decision * * *.

"Where certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest,' [citations omitted], and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake.

\* \* \* \* \* \*

"[T]he State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman * * *, and * * * it has still *another* important and legitimate interest in protecting the potentiality of human life. These interests are separate and distinct. Each grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes 'compelling.'

"With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point, in the light of present medical knowledge, is at approximately the end of the first trimester. * * * [F]rom and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.

\* \* \* \* \* \*

"With respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability [during the third trimester]. * * * If the State is interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother.

\* \* \* \* \* \*

"*The decision vindicates the right of the physician to administer medical treatment according to his professional judgment up to the points where important state interests provide compelling justifications for intervention. Up to those points, the abortion decision in all its aspects is inherently, and primarily, a medical decision, and basic responsibility for it must rest with the physician.*" (Emphasis added.) 410 U.S. at 155, 162–66, 93 S.Ct at 728, 731–33, 35 L.Ed.2d at 178, 182–84; *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

A.R.S. § 15–730 is unconstitutional as applied to the "Jane Roe" in this case, in her second trimester of pregnancy, because it is directly contra to the express directive in *Roe v. Wade*, supra, that state regulation of the abortion procedure during this period is permissible *only* "to the extent that the regulation reasonably relates to the preservation and protection of maternal health."[3] A blanket ban on abortions except to save the life of the mother[4] was held in *Roe v. Wade*, supra, to constitute an unconstitutional impediment to a woman's fundamental right to obtain an abortion unless the restriction is specifically limited to the third trimester of pregnancy.

It is improper for this court to ascribe constitutionality to a statute which contains a regulation the Supreme Court has explicitly stated exceeds a state's power to regulate on the theory that the plaintiff has failed to allege that some other public facility did not exist in that county where she could exercise her fundamental con-

---

3. "Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licens-

ing of the facility; and the like." *Roe v. Wade*, 410 U.S. at 163, 93 S.Ct. at 732, 35 L.Ed.2d at 182–83.

4. " * * * [U]nless such abortion is necessary to save the life of the woman having the abortion." A.R.S. § 15–730.

stitutional right without a similar restriction. No compelling reason has been advanced for such a distinction and I can think of none. *"The availability of an alternative means for women without funds to obtain abortions is not an issue in an action to enjoin the operation of the hospital's abortion policy."* (Emphasis added.) *Doe v. Mundy,* 514 F.2d 1179 (7th Cir. 1975). Speculation as to whether Jane Roe might have been able to obtain the medical services at some other public hospital has nothing whatsoever to do with the question of whether A.R.S. § 15-730 unconstitutionally infringed upon her right to privacy while a patient of a physician who conducted his practice at University Hospital.

Moreover, it is less than candid for the majority to allege that "[t]here is no suggestion that this [Pima County Hospital] facility would not have been available to the plaintiff for the abortion procedure." The only evidence in the record on this point indicates directly the opposite. In her "Memorandum in Support of Plaintiff's Motion for Class Action Status and for Partial Summary Judgment" submitted to the trial court Roe stated:

> " * * * [I]t should be noted by this Court that there are no public hospitals in Tucson which presently make its facilities available for the performance of abortions, the University Hospital excepted only because of the Temporary Restraining Order now in effect as a result of this lawsuit."[5]

No attempt was made by the State to controvert this assertion.

The clear interference by the State of Arizona with the medical judgment reached by the physician in consultation with his patient in this case is amply demonstrated by the affidavit of Dr. Harlan Giles attached to the plaintiff's "Motion for Tem-

porary Restraining Order and Preliminary Injunction" filed in the trial court:

"HARLAN GILES, M.D., being first duly sworn, deposes and says:

"1. I am licensed to practice medicine in Arizona.

"2. I am a Professor of Obstetrics and Gynecology at Arizona Medical Center. I am a staff physician at the University Hospital. My office is in the University Hospital where I see and treat all of my patients.

"3. Plaintiff, JANE ROE, is my patient and has been under my care for several months. On June 19, 1974, I examined her and determined that she was approximately sixteen to seventeen weeks pregnant, although she had previously undergone a procedure to terminate the pregnancy.

"4. On or about June 19, 1974, Plaintiff and I conferred and decided that her pregnancy should be terminated immediately. It was my best medical judgment that Plaintiff should have an abortion as soon as possible and that the abortion would not be injurious to her health.

"5. On or about May 17, 1974, I had been advised that because of the Arizona law and the Regents' policy, the University Hospital would not permit use of its facilities for the performance of abortions unless the abortion was necessary to save the life of the mother. I refused to perform the abortion on Plaintiff because of the above policy and because the abortion was not necessary to save her life.

"6. *I am the Plaintiff's treating physician. It is my professional responsibility and I desire to perform the abortion on her and to perform it at the University Hospital,* which is where I

---

5. The majority correctly notes that the plaintiff failed to include this assertion in the affidavits submitted in support of her motion. This omission was undoubtedly the result of her inability to anticipate that the majority would go so far as to rely on an irrelevant and discredited distinction in order to uphold the statute, ignoring unanimous case law in the area.

see and treat all of my patients and *where, in my judgment, Plaintiff's abortion should be performed.*

"7. Because Plaintiff is in her sixteenth to seventeenth week of pregnancy, she will need a saline abortion. Plaintiff has had two recent previous operations on her uterus. Each day she must wait for the abortion increases the risk to her health.

\*   \*   \*   \*   \*   \*

"9. I have determined it is in the best interest of Plaintiff, my patient, that I perform an abortion on her *at the University Hospital* as soon as possible. *I am unable to do so because of the Arizona law* and Regents' policy which prohibits the performance of abortions at the University Hospital." (Emphasis added.)

As noted by the majority, Roe stated in her affidavit submitted in support of the same motion that she concurred with the medical judgment expressed by her physician and requested that the operation be performed at University Hospital:

"\*   \*   \* Dr. Giles had advised me that I should have the abortion as soon as possible because the longer I wait the more risky the procedure will become. I wish Dr. Giles to perform the abortion because he is my physician and I have confidence and trust in him. *I wish to have the abortion performed at University Hospital* because Dr. Giles had advised me that in his judgment it is the Hospital of preference under the circumstances." (Emphasis added.)

The majority's implication that this case is distinguishable from the impressive list of decisions which nullified similar regulations because "[t]he University Hospital is a teaching hospital" is deceptive and without merit. The affidavit of Dr. Harlan Giles, attached to the plaintiff's "Motion for Class Action Status and for Partial Summary Judgment" filed in the trial court, indicates that the hospital offered its services to the general public and was uniquely suited to perform the conceivably risky operation recommended in this case:

\*   \*   \*   \*   \*   \*

"3. I am familiar with the general medical services provided at University Hospital and the hospital facilities available for performance of medical and surgical procedures.

"4. University Hospital provides general medical services to the community.

"5. University Hospital has full and adequate facilities for performance of abortions.

"6. University Hospital permits use of its facilities for the performance of medically indistinguishable surgical procedures in the same general area of medical practice as are abortions, some of which expose a patient to greater risks and impose a greater demand upon the resources of the hospital.

"7. University Hospital runs a full Obstetrics and Gynecology clinic. Staff physicians see many high-risk pregnancy patients from the community and many patients are referred from all over the state.

"8. Pregnant women with possible genetic problems are refered to University Hospital for genetic counseling and treatment.

"9. Prior to the effective date of the state law and Regent's policy restricting abortions at University Hospital, elective abortions were being performed there."

A strikingly similar controversy revolved around a policy limiting abortions at a Medical Center in Omaha, Nebraska, established by the College of Medicine of the University of Nebraska for the purpose of providing clinical medical education to medical students, interns and residents, and continuing medical education to practicing physicians in the State of Nebraska. The Medical Center also performed valuable medical services in the Omaha community and the State of Nebraska by providing patient

care, consultation and research. The District Court concluded:

> "[E]ven though the primary function of the Center is educational, it is inevitably engaged in providing a state run service to the community. In doing so it must not unconstitutionally infringe upon the fundamental rights of the people, whom it serves. Before it can regulate abortion, or the abortion decision at its facility it must comply with the law as stated in the *Roe* and *Nyberg* decisions. In both cases, it was held that the state could regulate abortion only if the regulation could be demonstrated to serve some 'compelling state interest.'

> "[footnote 10] What requires the Regents to demonstrate a 'compelling state interest' in this case * * * is the fact that they are * * * providing general health services to the community. In doing so, they have established an admissions policy which may discriminate between patients seeking an abortion and patients seeking other types of medical treatment. Since the people in the community, who look to the Medical Center for medical treatment have a 'fundamental right' to privacy in the abortion decision, the Center may not impede that right unless there is a 'compelling' reason for doing so." *Orr v. Koefoot*, 377 F. Supp. 673, at 681 (D.Neb.1974).[6]

The State of Arizona has failed to advance any interest much less a "compelling interest" which is served by the total ban on abortions at the University Hospital under A.R.S. § 15–730. The statute is in contravention of the express limitations on govermental interference with the fundamental right to an abortion during the second trimester announced by the Supreme Court in *Roe v. Wade,* supra.

No attempt has been made by the appellees to link the prohibition to the educational function of the institution. A state may limit or even proscribe the performance of procedures at its teaching hospital consistent with its goal of providing a well balanced curriculum to its students and its "compelling" interest in the quality of its medical practitioners.[7] Where the restriction impinges on fundamental right, however, as in this case, the State carries the burden of tying the regulation to this interest:[8]

> "[W]hen the admissions policy of the University Hospital intrudes upon the fundamental right to personal privacy, the University must be prepared to demonstrate that that intrusion is justified by a compelling state interest. And where, as here, a University Hospital which is providing substantial medical services to its community, has established an admissions policy, which treats 'indistinguishable' medical procedures differently, thereby intruding upon a fundamental constitutional right, it carries the burden of demonstrating that the edu-

---

6. In *Orr* the State unsuccessfully argued that non-therapeutic abortions could be limited to fifteen per week because this met the minimum requirements of education. Because of an absence of similar restrictions in conjunction with other medical procedures, the District Court concluded the admissions policy intruded upon the fundamental right to privacy without the requisite showing of a compelling state interest.

7. "The principle responsibility of these defendants is to establish a policy for the Medical Center which will facilitate and lead to the achievement of that [educational] goal. In discharging that responsibility the defendants have an important duty as elected officials to establish and maintain a balanced curriculum at the Medical Center. To the degree that the balanced curriculum depends upon regulations or limitation of abortions at the University Medical Center, these defendants have not only the right, but the solemn duty to formulate regulations designed to, on the one hand, maintain a proper balance in the curriculum of the Medical Center, and, on the other, to intrude upon personal privacy rights only so far as is necessary to assure the fulfillment of its goals." *Orr v. Koefoot*, 377 F.Supp. at 682.

8. This "compelling interest" of the State at its public teaching hospital is in addition to the two "compelling" points reached at the end of the first and second trimesters of pregnancy which were delineated by the Supreme Court in *Roe v. Wade,* supra.

cational and research missions of the University require this diverse admissions policy." *Orr v. Koefoot,* 377 F. Supp. at 682–83.

The obvious temptation to the appellees to advance the argument that A.R.S. § 15–730 is grounded in the educational needs of the medical center was apparently overcome by their recognition of its futility under the facts of the present case. Moreover, common sense would seem to indicate that a ban on any medical procedure which the Hospital was equipped to perform would hinder rather than enhance the education a student might receive.

The majority's constant reference to a woman's right of "choice" as being afforded constitutional protection and their conclusion that under the facts of this case "her freedom of choice is protected" is misleading and the result of an unreasonably restrictive reading of *Roe* and *Doe.* The decision to obtain an abortion necessarily involves more than the mere mental aspect of whether or not the procedure is appropriate. It inevitably includes such factors as when and where it will be performed, and by whom. This point was dealt with in *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d 1141 (7th Cir. 1974), cert. denied, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975):

> "The appellees seek to escape the mandate of *Roe* and *Doe* by contending that they were premised on state interference with a woman's right of privacy, at least in the first trimester, to *decide* to abort a pregnancy, and that the challenged regulations in the instant case do not affect the 'abortion decision.' We disagree. The regulations by their very nature restrict the abortion decision and affect whether and in what manner an abortion will take place. *The decision whether or not to abort a pregnancy cannot be made in a vacuum*

*without regard to who will perform the operation, where and under what conditions it will be performed, and what procedure will be followed.* All these are involved in any abortion decision and it is precisely these elements of the decision that the regulations here seek to control. The language in *Roe* and *Doe* makes very clear that even after the decision to abort a pregnancy is made that decision must be able to be 'effectuated by an abortion free of interference by the State.' *Roe, supra,* 410 U.S. at 163, 93 S.Ct. at 732." (Emphasis theirs and mine.) *Friendship Medical Center, Ltd. v. Chicago Board of Health,* 505 F.2d at 1151.

A.R.S. § 15–730 clearly abridged the appellant's freedom of "choice" to obtain a non-therapeutic abortion by arbitrarily banning that particular operation, failing to take cognizance of the fact that a fundamental right is at stake and that situations such as the instant would arise where the medical judgment of the physician was that the University Hospital was the facility of preference under the circumstances.

The majority casually disposes of the significant precedent cited by the appellant in support of her position by stating that *"Nyberg* and the above cases are distinguishable from the present case in that the cited cases involved facilities used for treatment of indigents without adequate alternate facilities being available." Even though I consider this an irrelevant distinction, and one which does not appear applicable to the facts of this case, it is interesting to note that *none* of the five federal court of appeals cases explicitly supports such a conclusion. Although the Court in *Hale Hospital*[9] stated that "other hospitals in the * * * primary service area" did not perform abortions, there was evidence that the operation was available in nearby Boston. *Doe v. Poelker*[10]

9. *Doe v. Hale Hospital,* 500 F.2d 144 (1st Cir. 1974), cert. denied 420 U.S. 907, 95 S.Ct. 825, 42 L.Ed.2d 837 (1975).

10. 515 F.2d 541 (8th Cir. 1975).

and *Hathaway* [11] both involved restrictions at city hospitals and no mention was made whether there were nearby county or state facilities and, if so, whether the procedure was obtainable there. In *Word* [12] the restrictions embodied in a city ordinance [13] applied only to abortion clinics and the ordinance specifically excepted public hospitals from its scope. The Court in *Nyberg* [14] arguably rejected the identical argument advanced by the majority in this case as it was unsuccessfully presented in a dissent from a denial of a petition for rehearing.

In addition, it is not totally accurate for the majority to allege that "[t]he sole and exclusive responsibility for the hospitalization and medical care of the indigent rests with the county." A.R.S. § 11–297.01 specifically provides that an indigent may be placed in the University Hospital when the patient requires a service provided by that facility that is not provided by the county hospital.[15]

Some critics of this dissent will inevitably assert that the resolution I advocate would automatically require every public medical facility in Arizona to open its doors to patients desiring abortions. This is not my position and I would firmly oppose any such requirement. What I do feel is that the Supreme Court decisions in *Roe* and *Doe* prohibit a state from enacting a statute such as A.R.S. § 15–730 which arbitrarily singles out and bans the performance of non-therapeutic abortions at its public teaching hospital where: that facility provides general medical services to the community; the facility possesses the equipment and expertise necessary to perform the operation; the facility permits the performance of medically indistinguishable surgical procedures in the same area of medical practice; the state is unable to relate the ban to the educational function of the facility; and it is the sound medical judgment of the physician with the concurrence of his patient that that particular facility has certain advantages and is where the procedure should be performed. A woman clearly does not have complete freedom of choice as to where she can obtain an abortion. She does, however, have a fundamental right *to privacy and freedom from "non-compelling"* governmental interference with her decision to obtain an abortion at a public facility such as the University Hospital under the facts of this case.

The obvious impetus for the passage of A.R.S. § 15–730 was the conscientious feeling on the part of many legislators and citizens that this particular procedure was repugnant to their personal religious and moral values. The Supreme Court, however, has given the person desiring such an operation a formidable shield from state regulation and fortunately or unfortunately this is the law of the land.

I must respectfully dissent.

STRUCKMEYER, Vice Chief Justice (concurring):

I concur in Justice Gordon's dissent in this case.

11. *Hathaway v. Worcester City Hospital*, 475 F.2d 701 (1st Cir. 1973).

12. *Word v. Poelker*, 495 F.2d 1349 (8th Cir. 1974).

13. "Be it ordained by the City of St. Louis, as follows:
   "Section One. Definition—As used in this Ordinance the term 'abortion clinic' is hereby defined to mean * * *, but excepting duly licensed general hospitals."

14. *Nyberg v. City of Virginia*, 495 F.2d 1342 (8th Cir. 1974), cert. denied 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136.

15. The cost of hospital care and treatment at the University Hospital is, however, a county charge payable by the county in which the patient maintains his residence. A.R.S. § 11–297.01(C).